**Charlene McCAMEY, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPART-MENT OF EMPLOYMENT SER-VICES, Respondent.**

**No. 04–AA–211.**

District of Columbia Court of Appeals.

Argued en banc Nov. 30, 2006.
Decided May 15, 2008.

Julie V. Abizaid, with whom David L. Elkind was on the brief, for petitioner.

Todd S. Kim, Solicitor General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Edward E. Schwab, Deputy Solicitor General at the time the brief was filed, and Sheila Kaplan, Assistant Attorney General, were on the brief, for respondent.

Before WASHINGTON, Chief Judge, and FARRELL, RUIZ, REID, GLICKMAN, KRAMER, FISHER, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

WASHINGTON, Chief Judge:

Charlene McCamey petitioned this court to review a decision of the Director of the District of Columbia Department of Em-ployment Services (D.C.DOES) that denied her workers' compensation claim for psychological injuries she alleges resulted from an accidental physical injury suffered in the course of her employment. A three-judge division of this court affirmed the Director's decision, holding that the Director's application of an objective test to workers' compensation claims involving psychological injuries was consistent with this court's prior decisions. We granted Ms. McCamey's petition for rehearing en banc to consider whether application of an objective standard, as currently defined, to psychological injuries that are related to work-related physical injuries is consistent with the language and purpose of our workers' compensation law. We conclude that it is not and accordingly must reverse.

## I.

Ms. McCamey was employed by the District of Columbia Public Schools (DCPS) as a visiting instructor for homebound students. On September 29, 2000, while on the job, Ms. McCamey suffered injuries to her forehead, lower back and neck when she fell as a result of the collapse of a table that she and another instructor were moving. The Administrative Law Judge (ALJ) who heard her case found that as a result of the fall, Ms. McCamey suffered frequent, extensive, and excruciating headaches. In addition, following the accident, McCamey was afflicted with "depression, panic attacks, confusion, auditory hallucinations, and memory loss."

The foregoing events, however, occurred in the context of a serious pre-existing psychological illness. During the mid–1990s, several years prior to the accident, Ms. McCamey had begun to experience psychological problems attributable in substantial part to the death of her father, who had spent most of his life in a mental hospital.[1] Ms. McCamey was treated by a

1. Ms. McCamey's condition was further ag-gravated by the death of her mother.

psychiatrist, Dr. Maria C. Hammill, and subsequently returned to work. It is undisputed that after completing her treatment regimen, Ms. McCamey was capable of performing her regular employment duties without incident. Indeed, the ALJ found that Ms. McCamey had not seen Dr. Hammill for several years prior to the workplace accident.

At issue in this case is Ms. McCamey's claim for temporary total disability benefits arising from the psychological injuries that she attributes to her workplace accident. Dr. Hammill, the treating psychiatrist, was of the opinion that the workplace incident exacerbated Ms. McCamey's pre-existing psychological disorder. Dr. Bruce Smoller, a psychiatrist who examined Ms. McCamey on behalf of DCPS, and who relied in part on an MRI scan of Ms. McCamey's brain and on thyroid tests, opined that the source of Ms. McCamey's psychological injury was not her accident, but rather a pre-existing psychosis. In a "Recommended Compensation Order" entered on April 22, 2003, the ALJ denied Ms. McCamey's claim for psychological injury. Applying to the record before him the Director's analysis in *Dailey v. 3M Co. & Northwest Nat'l Ins. Co.*, H & AS No. 85–259 (May 19, 1988), and this court's decision in *Porter v. District of Columbia Dep't of Employment Servs.*, 625 A.2d 886 (D.C.1993), the ALJ found

1. that "claimant herein has presented substantial evidence of a cognizable injury";

2. that Ms. McCamey's "stressors," *i.e.*, the aggravation of her pre-existing psychological condition, "did arise in the course of her employment," [2] but

3. that Ms. McCamey failed to satisfy the "objective" standard approved in

*Porter*, *i.e.*, that a person of normal sensibilities with no history of mental illness would have suffered a similar psychological injury.

Ms. McCamey appealed to the Director of D.C. DOES. On February 10, 2004, the Director affirmed the ALJ's decision. The Director found, as had the ALJ, that "Claimant's pre-existing condition was exacerbated by a physical injury." Nevertheless, the Director upheld the denial of compensation, reasoning that although Dr. Hammill and Dr. Smoller expressed different opinions, "[n]either opined, and the evidence did not show, that an individual who did not have a pre-existing anxiety disorder would have suffered a psychological injury as a result of trauma to the head."

Ms. McCamey filed a timely petition for review of the Director's decision. A three-judge panel of this court affirmed, holding that while Ms. McCamey's position was not "implausible in principle," it was nevertheless foreclosed due to the court's decisions in *Porter*, *supra*, 625 A.2d at 888–89, and *Landesberg v. District of Columbia Dep't of Employment Servs.*, 794 A.2d 607, 614–15 (D.C.2002). *See McCamey v. District of Columbia Dep't of Employment Servs.*, 886 A.2d 543, 548 (D.C.2005). Subsequently, this court granted Ms. McCamey's petition for rehearing en banc. *McCamey v. District of Columbia Dep't of Employment Servs.*, 896 A.2d 191 (D.C.2006).

## II.

### A. Standard of Review.

██ This court "will not disturb an agency decision if it rationally flows from the factual findings on which it is based and if those findings are supported by

---

**2.** Although the ALJ did not expressly so state, it appears that he credited Dr. Hammill's opinion over that of Dr. Smoller.

substantial evidence." *Children's Defense Fund v. District of Columbia Dep't of Employment Servs.*, 726 A.2d 1242, 1247 (D.C.1999). Therefore, this court will affirm the agency's ruling unless it is arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with the law. *See Landesberg, supra,* 794 A.2d at 612. Questions of law, however, are reviewed *de novo. See King v. District of Columbia Dep't of Employment Servs.*, 742 A.2d 460, 466 (D.C.1999). "To be sure, 'an agency's interpretation of its own regulations or of the statute which it administers is generally entitled to great deference from this court. There is, however, a well-recognized exception to this rule. When the agency's decision is inconsistent with the applicable statute ... we owe it far less deference, if indeed we owe it any deference at all.'" *Id.* (quoting *Columbia Realty Venture v. District of Columbia Rental Hous. Comm'n,* 590 A.2d 1043, 1046 (D.C.1991)). As we have noted before, "'the agency's interpretation of the statute it administers is not binding upon this court [if] it conflicts with the plain meaning of the statute or its legislative history.'" *Murphy v. District of Columbia Dep't of Employment Servs.*, 935 A.2d 1066, 1070 (D.C.2007) (quoting *Lincoln Hockey LLC v. District of Columbia Dep't of Employment Servs.*, 810 A.2d 862, 866 (D.C.2002)) (citations omitted). "[T]he judiciary is the final authority on issues of statutory construction." *Harris v. District of Columbia Office of Worker's Comp.*, 660 A.2d 404, 407 (D.C.1995) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778 (1984)).

■■■ Panel decisions by this court bind future divisions of the court. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971). The court sitting en banc, however, may overrule the decisions of prior divisions. *See id.* "Although the doctrine of *stare decisis* has considerable force in stat-

utory analysis because [the legislature] can correct a court's interpretive mistakes through legislation, we should not 'appl[y] *stare decisis* mechanically to prohibit overturning our earlier decision determining the meaning of statutes.'" *In re McBride,* 602 A.2d 626, 636 (D.C.1992) (en banc) (quoting *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 695, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

### B. Principles of Workers' Compensation Law.

The District of Columbia Workers' Compensation Act ("WCA") provides for the compensation of employees who suffer disabilities that are causally connected to workplace injuries. The WCA covers "[t]he injury or death of an employee that occurs in the District of Columbia if the employee performed work for the employer, at the time of the injury or death, while in the District of Columbia." D.C.Code § 32–1503(a)(1) (2001). The Act further defines "injury" as

> [A]ccidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of third persons directed against an employee because of his employment.

D.C.Code § 32–1501(12) (2001).

■■■ Workers' Compensation laws reflect a compromise between employees and employers regarding injuries arising out of employment. "The District of Columbia Workers' Compensation Act of 1979, like its 1928 predecessor, was enacted to provide a reasonably quick and efficient manner to compensate employees for disabilities resulting from employment-bred injuries. Employees and employers were both thought to gain by a system in which common law tort remedies were dis-

carded for assured compensation regardless of negligence or fault." *Ferreira v. District of Columbia Dep't of Employment Servs.*, 531 A.2d 651, 654 (D.C.1987) (footnote omitted); *cf.* D.C.Code § 32–1504(b) (2001) (providing that compensation under the Act is the employee's exclusive remedy against the employer for "any illness, injury, or death arising out of and in the course of his employment"). The purpose of workers' compensation laws, "which is to provide financial and medical benefits to employees injured in work-related accidents," is a humanitarian one. *Grayson v. District of Columbia Dep't of Employment Servs.*, 516 A.2d 909, 912 (D.C.1986). This court follows the principle that "workers' compensation statutes should be liberally construed to achieve their humanitarian purpose." *Vieira v. District of Columbia Dep't of Employment Servs.*, 721 A.2d 579, 584 (D.C.1998); *see also Ferreira, supra,* 531 A.2d at 655.

■■■■ The aggravation rule is an obvious example of meeting the humanitarian nature of the Act. "It is well-settled that 'an aggravation of a preexisting condition may [also] constitute a compensable accidental injury under the Act.'" *King, supra,* 742 A.2d at 468 (quoting *Ferreira, supra,* 531 A.2d at 660) (internal quotation omitted). "The fact that other, nonemployment related factors may also have contributed to, or additionally aggravated [petitioner's] malady, does not affect [the] right to compensation under the 'aggravation rule.'" *Ferreira, supra,* 531 A.2d at 660 (internal quotation omitted).[3] "If an employee experiences a work-related injury which, combined with a previous disability or physical impairment (work-related or non-work related) causes substantially greater disability or death, the liability of the employer shall be as if the subsequent injury alone caused the subsequent amount of disability." *Georgetown Univ. v. District of Columbia Dep't of Employment Servs.*, 830 A.2d 865, 873 (D.C.2003). In *Harris, supra,* 660 A.2d at 408, the court distinguished the *aggravation* of a pre-existing injury from a mere *recurrence* of the injury by requiring some intervening work-related event: "This is not a case, however, in which the 'recurrence' was the result of the natural progression of the condition, unaffected by any intervening work-connected cause." *See id.* (internal citation and quotation omitted); *see also* 9 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW § 153.02[3] (2007) ["LARSON'S"] ("To find that there has been an aggravation, it must be shown that the second episode contributed independently to the final disability.").

■■■■ The aggravation rule stems from the principle that the employer must take the employee as it finds him or her. "Employers must accept with their employees the frailties that predispose them to bodily hurt ... and if petitioner's disability arose *even in part* out of and in the course of [her] employment, compensation is appropriate." *Ferreira, supra,* 531 A.2d at 660 (internal citations and quotations omitted; emphasis in original). Professor Larson concurs:

> Preexisting disease or infirmity of the employee does not disqualify a claim

3. A presumption of compensability applies within the context of the aggravation rule: Under this jurisdiction's "aggravation rule," there is no question that "a particular medical condition [that] is a result of the compensable work injury" may itself be compensable and thus covered by the presumption. Where there is a dispute ... about whether the disabling aggravated condition ... is causally related to or "arose out of" the claimant's employment, the presumption applies and is triggered if the claimant produces "some evidence" of the two basic facts described in *Ferreira*. *Whittaker v. District of Columbia Dep't of Employment Servs.*, 668 A.2d 844, 846–47 (D.C. 1995).

under the "arising out of employment" requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought. This is sometimes expressed by saying that the employer takes the employee as it finds that employee.

1 LARSON'S, *supra*, at § 9.02[1]; *see id.* at § 9.02D[1] (citing cases expressing that employer takes the employee as it finds him or her).[4]

 Similarly, "DOES has recognized that the [WCA] covers complications flowing from a compensable injury." *Brown v. District of Columbia Dep't of Employment Servs.*, 700 A.2d 787, 791–92 (D.C.1997). "The rule is that a subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury." *Id.* (internal quotation omitted); *see* 1 LARSON'S, *supra*, at § 10.01 (same test). Larson notes that "cases in which an initial medical condition itself progresses into complications more serious than the original injury" present no legal controversy and "the added complications are of course compensable." *Id.* § 10.02. "[O]nce the work-connected character of any injury, such as a back injury, has been established, the subsequent progression of that condition remains compensable so long as the worsening is not shown to have been produced by an independent nonindustrial cause." *Id.*[5]

 Moreover, "[t]his jurisdiction has repeatedly rejected the notion that a 'specific traumatic injury' is necessary to es-

tablish a *prima facie* case of an 'accidental injury." *Ferreira, supra*, 531 A.2d at 656. "[T]he statutory language 'accidental injury' does not require that an unusual incident be the cause of the injury, but is satisfied if something unexpectedly goes wrong within the human frame." *Washington Metro. Area Trans. Auth. v. District of Columbia Dep't of Employment Servs.*, 506 A.2d 1127, 1130 (D.C.1986). "While the precise meaning of the 'human frame' definition of 'accidental injury' is undeniably elusive, it clearly encompasses two concepts." *Ferreira, supra*, 531 A.2d at 656. "First, the nature of the activity or event which results in or contributes to the injury may occur in the 'usual and ordinary course of work.' The work need not be unusual or unexpected." *Id.* "Second, the nature of the potential cause of the disability need not be a discrete, particularized event." *Id.*

 Indeed, the WCA features a statutory presumption of compensability. Under D.C.Code § 32–1521 (2001), it is presumed that a "claim comes within the provisions of this chapter" in the absence of any evidence to the contrary. "This sound presumption, designed to effectuate the humanitarian purposes of the statute, reflects a 'strong legislative policy favoring awards in arguable cases.'" *Ferreira, supra*, 531 A.2d at 655 (quoting *Wheatley v. Adler*, 132 U.S.App. D.C. 177, 183, 407 F.2d 307, 313 (1968) (en banc)). "In order to benefit from the presumption, a claimant needs to make some 'initial demonstration' of the employment-connection of the disability." *Id.* (quoting 1 ARTHUR LARSON, WORKMEN'S COMPENSATION LAW § 10.33, at 3–138 (1986)). "The initial demonstration

---

4. According to Larson, "[t]he preexisting condition may be any kind of weakness.... It may be mental or nervous in character." 1 LARSON'S, *supra*, at § 9.02[3]; *see id.* at § 9.02D[3] at D9–77 (citing cases).

5. Relevant to this case, Larson notes, in the section on subsequent injuries, "[t]he situation is no different when the subsequent complication takes the form of a neurosis rather than a physical exacerbation." 1 LARSON'S, *supra*, at § 10.02 (2007).

consists in providing some evidence of the existence of two 'basic facts': a death or disability and a work-related event, activity, or requirement which has the *potential* of resulting in or contributing to the death or disability." *Id.* (emphasis in original). "The presumption then operates to establish a causal connection between the disability and the work-related event, activity, or requirement." *Id.* "Once the presumption is triggered, the burden is upon the employer to bring forth 'substantial evidence' showing that the death or disability did not arise out of and in the course of employment." *Id.* This court has held that expert testimony is not required to invoke the presumption. *See McNeal v. District of Columbia Dep't of Employment Servs.,* 917 A.2d 652, 658 (D.C.2007) ("[Claimant] was not obliged to present expert opinion of causation in order to enjoy the benefit of the presumption. It was not [his] burden to do that unless and until the employer presented sufficient evidence to rebut the presumed causal connection.") (internal quotation omitted).[6]

### C. D.C. Government Comprehensive Merit Personnel Act.

 While the WCA applies to private-sector employees in the District, Chapter 23 of the District of Columbia Government Comprehensive Merit Personnel Act ("CMPA") governs disability claims of District of Columbia employees.[7] *See*

D.C.Code § 1–623.01 *et seq.* (2001); *Kralick v. District of Columbia Dep't of Employment Servs.,* 842 A.2d 705, 710 (D.C. 2004); *see also Jackson v. District of Columbia Employees' Compensation Appeals Bd.,* 537 A.2d 576, 577 n. 1 (D.C.1988) ("[A] comparable system for providing disability benefits has been established under the District of Columbia Government Comprehensive Merit Personnel Act"). The CMPA provides for the compensation of disabilities causally connected to workplace injuries:

> The District of Columbia shall pay compensation as specified by this subchapter for the disability or death of an employee resulting from personal injury sustained while in the performance of his or her duty, unless the injury or death is: (1) caused by willful misconduct of the employee; (2) caused by the employee's intention to bring about the injury or death of himself or herself or of another; or (3) proximately caused by the intoxication of the injured employee.

D.C.Code § 1–623.02.[8]

The two acts are conceptually close, *see District of Columbia v. Thompson,* 570 A.2d 277, 286 (D.C.1990), *aff'd in relevant part,* 593 A.2d 621, 635–36 (D.C.1991), and this court has considered case law under one act to be "informative" as to the other. *See Estate of Underwood v. Nat'l Credit Union Admin.,* 665 A.2d 621, 631 (D.C. 1995).[9] For example, the CMPA defines

---

6. However, "[n]otwithstanding the statutory presumption of compensability, the burden ultimately falls on the claimant to show by a preponderance of the evidence that his or her disability was caused by a work-related injury." *Washington Hosp. Ctr. v. District of Columbia Dep't of Employment Servs.,* 744 A.2d 992, 998 (D.C.2000).

7. The CMPA was "enacted to create a modern, flexible, and comprehensive system of public personnel administration in the District of Columbia government." *Council of*

*School Officers v. Vaughn,* 553 A.2d 1222, 1225 (D.C.1989).

8. By contrast, the WCA covers "[t]he injury or death of an employee that occurs in the District of Columbia if the employee performed work for the employer, at the time of the injury or death, while in the District of Columbia." D.C.Code § 32–1503(a)(1).

9. We note as well that the D.C. Council has amended the CMPA on more than one occasion to align it more closely with the WCA. *See* REPORT OF THE COUNCIL OF THE DISTRICT OF

"injury," *inter alia,* as "injury by accident," *see* D.C.Code § 1–623.01(5), while the WCA defines "injury" as "accidental injury or death arising out of and in the course of employment," *see* D.C.Code § 32–1501(12). Moreover, CMPA's "injury sustained while in the performance of his or her duty" provision has been construed as requiring that the "injury arise out of and in the course of employment," the same standard used under the WCA. *See Wright v. D.C. Dep't of Public Works,* ECAB No. 88–40, 1991 D.C. Wrk. Comp. LEXIS 1, **3–4 (D.C. Dep't of Employment Servs., Sept. 13, 1991) (looking to case law involving the Federal Employees' Compensation Act to define "while in the performance of duty," and noting that " '[a]rising out of and in the course of' are generally accepted as the coverage formula in most jurisdictions"); *see also In re Christine Lawrence,* 36 ECAB 422, 424 (1985) ("The phrase 'while in the performance of duty' has been interpreted by the [Employees' Compensation Appeals] Board to be the equivalent of the commonly found prerequisite in workmen's compensation law of 'arising out of and in the course of employment.' ").

Though there are some differences between the two statutes, they do not materi-

ally alter the analysis of this case involving a psychological injury that is related to a physical injury suffered in the course of employment. Of note, however, is the aggravation rule, which the WCA expressly codifies, *see* D.C.Code § 32–1508(6)(A) (2001)[10], but the CMPA does not. The D.C. Council based Chapter 23 of the CMPA on its pre-existing federal counterpart, the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 *et seq. See* REPORT OF THE COMMITTEE ON GOVERNMENT OPERATIONS, BILL No. 2–10, District of Columbia Government Comprehensive Merit Personnel Act of 1978 (July 5, 1978) [D.C. Law No. 2–139] at 112 (providing that Chapter 23's program of disability compensation "is essentially an enactment of current federal law."). Consistent with the Act's genesis, this court has analogized provisions of the CMPA to FECA. *See Thompson, supra,* 570 A.2d at 285 (construing a provision in CMPA by citing to case law construing the Federal Employees Compensation Act, "which is identical to the disability compensation portion of CMPA"); *cf. Wright, supra,* 1991 D.C. Wrk. Comp. LEXIS 1 at *4 (D.C. Department of Employment Services adopting Employees' Compensation Appeals Board interpretation of identical FECA provi-

COLUMBIA, BILL No. 8–74, District of Columbia Workers' Compensation Equity Amendment Act of 1990 (July 6, 1990) [D.C. Law No. 8–198] at 3 (explaining that the purpose of the Bill "is to amend the District of Columbia Workers' Compensation Act of 1979 ('Act') and title 23 of the District of Columbia Merit Personnel Act of 1978 in order to standardize certain workers' compensation benefits of public and private employees in the District of Columbia ('District'), promote a fairer system of compensation, and establish a commission for the review of the procedure and method of rate making for the District."); REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA, BILL No. 12–618, Fiscal Year 1999 Budget Support Act of 1998 (May 5, 1998) [D.C. Law No. 12–175] at 12 ("Section 2102 [of the Bill] amends provisions in the CMPA that establish the

disability program for District employees. The amendments are designed to make disability hearing procedures for public employees substantially similar to the procedures for private employees under the workers' compensation statute. They are intended to make the procedures speedier and to permit the District, as employer, the same rights to present evidence and to appeal decisions to which private sector employers are entitled.").

10. "If an employee receives an injury, which combined with a previous occupational or nonoccupational disability or physical impairment causes substantially greater disability or death, the liability of the employer shall be as if the subsequent injury alone caused the subsequent amount of disability...." D.C.Code § 32–1508(6)(A).

sion). Similar to the CMPA, FECA does not statutorily provide for the aggravation rule [11]; however, the Employees' Compensation Appeals Board ("ECAB")—the administrative adjudicatory body charged with reviewing FECA claims [12]—has made it clear that aggravations of pre-existing injuries are compensable under FECA:

> The [ECAB] has held that it matters not what the state or condition of the health of the employee might be; if the conditions of employment constitute the precipitating cause of disability, such disability is compensable as having resulted from accidental injury arising out of the employment. The aggravation of a preexisting disease or defect is as compensable as an original or new injury.

*In re Eloise C. West,* Dkt. No. 94–1439, 1996 WL 1357781, *4 (E.C.A.B.1996). Indeed, the ECAB has applied this principle to claims involving emotional injury as well:

> A preexisting condition, which may be mental or nervous in character, does not disqualify a claim if the employment aggravated, accelerated, or combined with the condition to produce the death or disability for which compensation is sought. This is sometimes expressed by saying that the employer takes the employee as he finds him.

*In re Victor I. Hasson,* 42 ECAB 153, 159 (1990) (citing, *inter alia,* LARSON'S WORKERS' COMPENSATION treatise). Thus, just as this court, the ECAB has justified the application of the aggravation rule via the well-settled proposition that employers must take their employees as they find them. Therefore, in light of the conceptual closeness of the CMPA to the WCA, as well as the CMPA to FECA, along with the underlying humanitarian purpose of

those Acts, we can discern no reason why this fundamental principle of workers' compensation law would not apply in the context of the CMPA. *See* 1 LARSON'S, *supra,* at § 9.02[1] (explaining the basis for the aggravation rule).

**D. District of Columbia tests regarding psychological injuries.**

The present dispute concerns the application of a so-called objective test or standard for determining entitlement to compensation, a test defined as requiring an employee seeking compensation for psychological injuries to show that an average person not predisposed to such injury would have suffered a similar injury. In this case, *McCamey, supra,* 886 A.2d at 548 the panel rejected Ms. McCamey's argument that this objective standard should not apply to cases involving psychological injuries that result from accidental physical injuries occurring in the workplace. The panel concluded that Ms. McCamey's position, while not "implausible in principle," was foreclosed due to the court's decisions in *Porter, supra,* 625 A.2d at 888–89 and *Landesberg, supra,* 794 A.2d at 614–15. In those cases, this court held that the objective test, which had up to then been applied only in cases involving psychological injuries caused by emotional or mental stress ("mental-mental" cases), could properly be applied by DOES to psychological injuries stemming from physical accidents ("physical-mental"). *See McCamey, supra,* 886 A.2d at 547–48. On rehearing en banc, McCamey urges that such an expansion was improper, contrary to the test that is applied universally throughout the United States, and inconsistent with the workers' compensation statute.

---

11. The CMPA and the FECA provisions regarding compensation for disability or death of an employee and their definitions of "injury" are identical. *Compare* D.C.Code §§ 1– 623.02, –623.05(5), *with* 5 U.S.C. §§ 8102, 8101(5).

12. *See* 5 U.S.C. § 8149.

A review of the historical development of the objective test in the District as well as a review of jurisprudence from other jurisdictions provides strong support for Ms. McCamey's position. The expansion of the objective test from mental-mental cases to physical-mental cases is inconsistent with the language, legislative history, and purpose of the Workers' Compensation Act and the CMPA. Its application deprives an entire class of employees (including claimants with pre-existing psychological conditions) of compensation for injuries *that they can prove* are connected to workplace accidents. Because the workers' compensation statutes · exist for the purpose of compensating employees for work-related injuries, the objective test (at least as applied to physical-mental claims) is inconsistent with the statute and must be overturned.

### 1. *McEvily* to *Dailey* to *Spartin.*

Our review of D.C. case law involving the application of an objective test to psychological disability claims begins with *McEvily v. District of Columbia Dep't of Employment Servs.*, 500 A.2d 1022 (D.C. 1985). In *McEvily,* the claimant served as head of WMATA's employee benefits branch. Despite initially having a positive work experience, claimant began to experience frustration as a result of managerial changes in the personnel department. *Id.* at 1022. Although McEvily's new supervisor did not criticize or embarrass him, he grew frustrated over her inattentiveness and her failure to act on or approve his proposals. *Id.* at 1022–23. "Believing that it was necessary for his mental health to give up his job, petitioner stopped working on December 1, 1982." *Id.* at 1023. Subsequently, he filed a workers' compensation claim for a psychiatric disability (depressive reaction). *Id.*

At the hearing, he testified on his own behalf; meanwhile, WMATA called a board-certified psychiatrist, who testified based on an independent medical examination that (1) McEvily suffered from a cyclothymic disorder and a narcissistic personality disorder, but that (2) both disorders pre-existed his employment with WMATA. *Id.* Therefore, the doctor opined "that there was no connection between his work situation and his predisposition to the illness which he experienced." *Id.* According to the court, "Dr. Schulman could not find any incident, experience, or ongoing occurrence that represented a significant stressor that would have affected anyone who was not so predisposed. He concluded that there could be no reasonable assessment of job-related stress, because the nature of that stress was highly subjective to petitioner." *Id.* The examiner denied his claim, finding that the depression did not arise out of the employment. *Id.* The Director · affirmed, "concluding that petitioner's evidence did not give a 'rationalized account of the causal relationship between the depression and [petitioner's] work." *Id.* Based on its review of the record, this court affirmed, "find[ing] substantial evidence to support the conclusion that petitioner did not suffer a compensable injury under the Act." *Id.* at 1024. Notably, this court affirmed on substantial evidence grounds (in a case where the claimant did not produce medical evidence himself). The court did not enunciate an objective test, but rather held that the employer's expert's opinion that there was no work-related connection supported the examiner's conclusion that the depression was not connected to the employment.

Drawing partly on *McEvily,* the Director set forth the objective test in *Dailey v. 3M Co. & Northwest Nat'l Ins. Co.*, H & AS No. 85–259 (May 19, 1988). Dailey was a secretary who worked in Indianapolis but accepted relocation to Washington, D.C. in lieu of the termination of her position. *Id.* at *1. However, after relocation,

she began to suffer from depression and an ulcer; she then stopped working and returned to her family in Indiana. *Id.* at **1–2. After the hearing examiner denied her claim—finding that her depression did not arise out of her employment—she appealed to the Director, claiming that her "predisposition to a depressive condition should not bar her eligibility for benefits when work-related events aggravated her pre-existing condition." *Id.* at **2–3. The hearing examiner noted the testimony of the claimant's psychiatrist that the claimant "was intact" prior to her move as well as his conclusion that her condition was caused by her work, but further noted the doctor's opinion that the claimant suffered from obsessive-compulsive disorder "and a significant inability to deal with life's difficulties." *Id.* at **3–4. Based on this information, the examiner "conclude[d] ... that, had claimant not been otherwise so predisposed, the changes in her job situation would not have affected claimant in the manner in which they did [13] .... Furthermore, [the examiner did] not find those changes occurring in claimant's life unusual or uncommon to the workplace." *Id.* at *4. The examiner also noted that other life events affected claimant as well. *Id.*

On administrative appeal, the Director reviewed case law from the Agency and D.C. regarding claims of mental disabilities arising from employment. The Director cited *McEvily* and interpreted this court's *McEvily* decision as holding "that for persons having a significant predisposition to a particular emotional injury, there must be some type of incident, experience, or occurrence at work which could have affected someone who was not significantly predisposed to that type of injury." *Id.* at *5 (citing *McEvily, supra,* 500 A.2d at 1023). The Director then examined the Agency's prior decision in *Chaney v.*

*Southeastern Univ.,* H & AS No. 84–350 (Apr. 6, 1986) as it was summarized by the Director's decision in *Wenzel v. British Airways:*

> The *Chaney* decision held that, at the very least, the concept of "arising out of the employment" requires a showing that there were obligations placed on employee or conditions under which the employee performed which exposed him to risks or dangers which could have [led] to the kind of psychological injury actually suffered.... Thus, to support the ultimate finding that a psychological injury arises out of the employment there must be a finding, supported by the evidence, that *within the conditions of the workplace there was a specific, articulable source of injury* in the workplace and a finding, supported by medical evidence, that the alleged source of the injury could have produced the kind of injury the employee suffered....
>
> In requiring more than a showing that an employee had a medically harmful, psychologically adverse reaction to the work environment, *Chaney* emphasized that *it is the employment, and not the make-up of the employee,* which must account for the source of the employee's stress. If there is nothing discernible in the employment which for articulable reasons would ordinarily account for the employee's severe reaction, then the employee's injury does not arise out of the employment. Thus, inasmuch as *Chaney* directs attention to the work environment, and not to the employee's perception of his work environment, a factfinder has an objective basis on which to make his findings.

*Id.* at **6–7 (quoting *Wenzel v. British Airways,* H & AS No. 84–308, * *6–7 (Oct. 6, 1985)) (emphasis added). In *Chaney,* therefore, the Director had established an objective test requiring the claimant to

---

**13.** The examiner cited *McEvily* (though the decision from the Director) as support.

proffer evidence of "a specific, articulable source of injury"—that is, something tangible about the work environment—rather than relying on the claimant's purely subjective perceptions or on the mere evidence that an adverse reaction occurred.

However, the Director then read *McEvily* and *Chaney/Wenzel* together to require a different test. The Director's understanding of *McEvily* (as noted above) is quite similar to the Director's view of *Chaney/Wenzel;* however, *McEvily* involved someone pre-disposed to psychological injury. The Director combined the interpretation of *McEvily,* that a claimant predisposed to injury must offer evidence of "some type of incident, experience, or occurrence at work which could have affected someone who was not significantly predisposed to that type of injury," with its requirement of a specific, articulable source of injury from *Chaney/Wenzel* to produce the test we now refer to as the *Dailey* test:

> [T]he Director now specifically holds, that in order for a claimant to establish that an emotional injury arises out of the mental stress or mental stimulus of employment, the claimant must show that actual conditions of employment, as determined by an objective standard and not merely the claimant's subjective perception of his working conditions, were the cause of his emotional injury. The objective standard is satisfied where the claimant shows that the actual working conditions could have caused similar emotional injury in a person who was not significantly predisposed to such injury.

*Dailey, supra,* at \*\*7–8. This test shifted the focus from an objective examination of the workplace environment to an examination of both the environment and the employee.[14] This had the added effect of erecting a stricter barrier for those claimants who had previously suffered from psychological conditions—because these claimants could no longer point to themselves as examples, the focus necessarily shifted to a hypothetical, average third person.

This court confronted the *Dailey* test in *Spartin v. District of Columbia Dep't of Employment Servs.,* 584 A.2d 564 (D.C. 1990), a case involving another mental-mental claim. The petitioner in *Spartin* had been the president of a large human resources consulting firm. *Id.* at 565. Although he had to work hard, he viewed his job as "fun and exciting" until a larger London based firm bought out his company, made him Chairman of the Board of an international recruiting company, and assigned him numerous new responsibilities on top of his already substantial job. *Id.* at 565–66. Eventually, petitioner sought medical care for what he thought was a heart attack; his physician, however, diagnosed him as suffering from depression-related disorders and referred him for psychiatric and psychological care. *Id.* at 566. After being diagnosed with serious depression, he quit working and filed a workers' compensation claim. *Id.* His employer of-

---

**14.** The Director recognized the alteration of the test:

> The objective standard which the Director establishes in this decision is a departure from the *Chaney* decision which only uses an objective standard to determine whether there are actual specific articulable sources of stress in the work place. Assuming that an actual specific articulable source of stress is identified and established, and assuming that the medical evidence establishes a causal connection between the actual specific articulable source of stress and the alleged work injury, *Chaney* would allow for a finding that the injury arose out of the employment even if the source of stress would not have affected a person who was not predisposed to the particular injury.
>
> *Dailey, supra,* at \*8 n. 1.

fered the testimony of a psychiatrist who opined that claimant suffered from depression and dementia, but that those conditions were not attributable to his job—apparently suggesting that the dementia was related to some type of metabolic disturbance and the depression to his experience of chest pain. *Id.* at 567–68. The hearing examiner credited the employer's psychiatrist and concluded that "petitioner had not met his burden of demonstrating that the actual conditions of employment, as determined by an objective standard and not merely the petitioner's subjective perception of his working condition, caused the emotional injury." *Id.* at 568.

On review by this court, the petitioner challenged the application of the *Dailey* test. *Id.* This court noted that "[a]lthough the general rule of causation in workers' compensation cases is to be liberally construed ... the Director has crafted special standards for certain types of claimed injuries," and that *Dailey* was such a test. *Id.* (internal quotations and citation omitted). According to the court,

> Viewed generally, insofar as it requires an objective demonstration of job stressors, *Dailey* fits within the modern trend to compensate workers for emotional injury caused by job stress.... Professor Larson advocates an "objective" standard for such cases that is very similar to the *Dailey* test: "in order for non-traumatically caused mental injury to be compensable in a workmen's compensation case, the injury must have resulted from a situation of greater dimensions than the day-to-day mental

stress and tensions which all employees must experience."

*Id.* at 569 (quoting 1B A. LARSON, WORKMEN'S COMPENSATION LAW § 42.23(b) (1987)) (internal citation and footnote omitted). This comparison between *Dailey* and LARSON's view of the modern trend reveals two important points: (1) they relate to compensation "for emotional injury caused by job stress," and (2) the objective test examines the conditions of the workplace environment.

The court went on, however, to state that neither the hearing examiner nor the Director had properly applied *Dailey*, explaining,

> The *Dailey* test is objective: it focuses on whether the stresses of the job were so great that they could have caused harm to an average worker. As the Director explained in *Dailey*, job stresses are to be "measured against the usual stressors or mental stimuli of employment in general."... Thus, a claimant must show under the *Dailey* test that his current job conditions are unusually stressful as compared to employment conditions in general, not as compared to his work history.

*Spartin, supra*, 584 A.2d at 569 (internal citation omitted).

The court then noted that the Director in *Dailey* acknowledged that " 'a work related aggravation of a pre-existing condition can be compensable under the law of workers' compensation." *Id.* at 570 (quoting *Dailey, supra*, at 9).[15] The court then opined,

---

**15.** In *Dailey*, the Director confirmed that aggravation of pre-existing injuries via workplace accidents is compensable; however, the Director suggested its application was inappropriate in that case because the claimant could not establish legal causation—that is, that the examiner had found that the claimant's mental injury was "caused by her own personal make up and non-work related factors, as opposed to being caused by events or conditions of her employment." *Dailey, supra*, at **10–11. Thus, under this reading, the claimant would have to prove a connection between her mental injury and the workplace environment by showing that someone who was not predisposed would have suffered her injuries. If she demonstrated that the hypothetical person would have so suffered, then *she receives compensation despite her predis-*

[a]lthough recovery for aggravation of a preexisting condition may seem incompatible with the *Dailey* test's focus on a hypothetical employee who is not "predisposed" to injury, we do not read *Dailey* to preclude recovery where a claimant comes to the job with a preexisting psychological condition. Under *Dailey*, an employee predisposed to psychic injury could recover if he is exposed to work conditions so stressful that a normal employee might have suffered similar injury. Thus, an employee with a predisposition to mental illness is not precluded from recovering under *Dailey*. *Only when so interpreted is the Dailey standard compatible with the Workers' Compensation Act.*

*Id.* (emphasis added). As interpreted by *Spartin*, therefore, the *Dailey* test was intended to preserve the right of persons predisposed to mental injury to recover in some cases, but only where a "normal person might have suffered similar injury." In succeeding decisions, the *Dailey* rule has continued to be applied in a way that forecloses compensation unless a "normal" or "average" employee would experience similar injury.

This review demonstrates that the court's development of the objective standard occurred wholly within the context of mental-mental claims; indeed, entirely within mental-mental claims involving non-traumatic or gradual stress. It is clear that the Director and this court have acknowledged the difficulty inherent in evaluating claims of psychological disability and have attempted to address the problem by imposing a measure of objectivity: "[C]laims of work related emotional injury are among the most difficult to handle and adjudicate. While in theory work related mental injuries are as compensable as

work related physical injuries, the adjudication of mental injury claims clearly presents more difficult problems. Mental injury claims are more difficult because of the inherent difficulties of objectively determining the existence of an injury and its source." *Dailey, supra,* at 15. However, as noted, the test shifted over time from an objective examination of the employee's workplace environment to one that examined both the environment and the employee's particular susceptibilities. If an employee was predisposed to injury, then that employee would have to point to a hypothetical third person. It is within this admittedly unsettled context that the court expanded the application of the objective test to physical-mental claims.

### 2. *Porter* and *Landesberg*.

This court first considered application of the objective test to a psychological injury claim springing from a physical workplace accident, as opposed to one arising from gradual workplace stress, in *Porter, supra,* 625 A.2d at 886. In *Porter,* the petitioner was injured when a gurney struck her while she performed duties as a nursing assistant at George Washington University Hospital. *Id.* at 888. The petitioner contended that she suffered a disability due to post-traumatic stress disorder and that the disability was traceable to the gurney incident; her board-certified psychiatrist supported this theory at her hearing. *Id.* In response, her employer relied on testimony from another board-certified psychiatrist who opined that the petitioner's severe depression was linked not to the gurney incident, but stemmed from a preexisting hysterical/hypochondriacal personality disorder marked by cyclothymic features. *Id.* The Hearing Ex-

---

position because the pre-existing injury would have been shown to have been aggravated by

a work-place condition.

aminer credited the latter testimony and found that the disability stemmed from a preexisting mental condition; the Director affirmed. *Id.*

On review, this court considered whether the administrative adjudicators applied a standard consistent with the Act, and concluded that they did. The court first reviewed *McEvily,* and noted that in that case, both the Hearing Examiner and Director "implicitly approved the test for causation reflected in the [testifying] psychiatrist's evaluation .... '[the psychiatrist] could not find any incident, experience, or ongoing occurrence that represented a significant stressor *that would have affected anyone who was not so predisposed* [to the depressive reaction]. He concluded that there could be no reasonable assessment of job-related stress, because the nature of that stress was highly subjective to petitioner.'" *Porter, supra,* 625 A.2d at 888 (quoting *McEvily, supra,* 500 A.2d at 1022) (emphasis in *Porter*). Next, the court reviewed *Spartin,* and confirmed that this court adopted the *Dailey* objective test. Notably, the court quoted the following passage from *Spartin:* " 'an employee predisposed to psychic injury could recover if he is exposed to work conditions *so stressful that a normal employee might have suffered similar injury.* Thus, an employee with a predisposition to mental illness is not precluded from recovering under *Dailey.*'" *Porter, supra,* 625 A.2d at 889 (quoting *Spartin, supra,* 584 A.2d at 570) (emphasis in *Porter*). The court reaffirmed that *Dai-*

*ley* fit within the modern trend of compensating "emotional injury caused by job stress," regardless of predisposition, "but that the test 'is objective: it focuses on whether the stresses of the job were so great that they could have caused harm to an *average worker.*'" *Porter, supra,* 625 A.2d at 889 (quoting *Spartin, supra,* 584 A.2d at 569) (emphasis in *Porter*). Thus, to this point in the *Porter* decision, the court merely reaffirmed *Spartin's* adoption of the *Dailey* test—which itself is a conflation of an objective test focused purely on stressors within the workplace environment with one that takes into account a particular employee's predisposition to a certain injury.

According to the court, the hearing examiner found that the petitioner's condition was not causally related to her work injuries, but was related *solely* to her preexisting disability. *Porter, supra,* 625 A.2d at 889. The Director affirmed that it was not work-related "because no 'specific, articulable source' rooted in the job, no 'concrete *non-personal* stressors' had been identified as its cause." *Id.* (quoting Director) (emphasis in *Porter*). The court interpreted these conclusions: "[b]oth the examiner and the Director concluded, in other words, that the gurney accident would not have caused a person lacking petitioner's subjective, pre-existing personality disorder to suffer the disability she now experienced." *Id.*[16]

With this as background, the court stated, "[a]s in *Spartin,* we perceive no reason here why the agency's application of an objective causal test to petitioner's claim of

---

**16.** However, another possible interpretation is that the hearing examiner's conclusion that the injury "related solely to" her preexisting disorder demonstrates a factual credibility determination finding that the employer's psychiatrist fully rebutted the petitioner's evidence of causal connection. Thus, it is possible that the hearing examiner or director may

have reached a different conclusion had the examiner believed that the gurney incident contributed to the injury. As the court in *Porter* notes, the hearing examiner issued her findings three months *prior* to the Director's *Dailey* decision. *See Porter, supra,* 625 A.2d at 889 n. 3.

emotional injury is inconsistent with the Workers' Compensation Act." *Id.* Moreover, the court in *Porter* went on to expand *Dailey* to cover physical-mental claims as well:

Nor is it decisive that petitioner, unlike the claimant in *Spartin*, cites a specific job-related accident as the cause of her disorder rather than less easily identified conditions of *stress* in the employment. Whatever the triggering event or condition, the Director may properly apply a rule for causation in this difficult area of emotional injury that discourages spurious claims—one focusing on [1] the *objective conditions of the job* and [2] *their effect on the 'normal employee'* not predisposed to the injury by a mental disorder.

*Porter, supra,* 625 A.2d at 889 (brackets and emphasis added). The court cites no additional authority for this expansion.

 Clearly, the court seems to defer to the Director to interpret the Act reasonably in such a way that discourages spurious claims for compensation. However, this expansion reveals the flaw in the *Dailey* test that becomes particularly heightened in the context of physical-mental claims. In such cases, the physical accident supplies the "objective conditions of the job" far more clearly than a general allegation of gradual workplace stress, which almost necessarily develops over time. But the Director's concern with the difficulties of proving workplace causation in the case of persons predisposed to men-

tal injury may not displace the protections of the Act. More precisely, neither the Director nor this court may interpret the Act in such a way that prevents those with preexisting conditions from establishing that they are entitled to compensation as to do so would ignore the aggravation rule and be inconsistent with a humanitarian act whose principal purpose is to compensate employees for injuries they prove to be work-related. *See Spartin, supra,* 584 A.2d at 570 ("[A]n employee with a predisposition to mental illness is not precluded from recovering under *Dailey*. Only when so interpreted is the *Dailey* standard compatible with the Workers' Compensation Act.").

In *Dailey*, the reason the Director rejected the aggravation of a pre-existing injury argument was because claimant failed to prove legal causation—the examiner did not credit her psychiatrists' testimony that her emotional injury was related to her work conditions.[17] The reason that the objective test was required was because of the inability to pinpoint something different about the work environment or conditions of that job. In the context of physical-mental disabilities, the physical accident is the unexpected occurrence supplying the necessary (and objective) workplace connection. Thus, in cases of physical injury, so long as the claimant proffers competent medical evidence connecting the mental disability to the physical accident (legal causation), the claimant has either established a prima facie case of aggravation or a new injury. That being

---

17. "While the Director readily agrees that a work related aggravation of a pre-existing condition can be compensable under the law of workers' compensation, in this case, there was a specific finding that claimant's injury did not arise out of her employment. In other words, to say that one's working conditions have aggravated a pre-existing condition, presupposes that legal causation has already been established between the

pre-existing condition and the injury which is attributed to the employment conditions; but in this case, legal causation was never established. The thrust of the Hearing Examiner's finding was that whatever emotional problems claimant experienced were caused by her own personal make up and non-work related factors, as opposed to being caused by events or conditions of her employment." *Dailey, supra,* at 10–11.

the case, the objective test is simply unnecessary. Put another way, the pure objective test is always met in physical-mental cases, provided that the claimant proves the connection between the mental condition and the physical accident.

Following *Porter*, this court has continued to apply the *Dailey* standard to physical mental claims. In *Landesberg*, the court affirmed the Director and hearing examiner's denial of benefits to an employee who claimed she developed post-traumatic stress disorder following a workplace accident involving the closing of Metro bus doors based on findings that (1) the claimant was predisposed to psychological problems, and (2) per a psychiatrist's opinion, the conditions causing the emotional injury were not "so stressful that a reasonable person not predisposed to psychological injury might suffer the same injury." 794 A.2d at 613–14. Relying on *Porter*, the court noted, "psychological injuries are only compensable under the Act if the accident constitutes a sufficient stressor." *Id.* at 614 (citing *Porter, supra*, 625 A.2d at 889). The division in *McCamey* followed *Porter* and *Landesberg*:

> [W]e have held that the statute reaches the aggravation of an employee's *physical* condition resulting from work-place injuries. But in light of *Porter* and *Landesberg*, as well as *McEvily* and other authorities cited in *Porter*, Ms. McCamey's position, though ably and conscientiously presented, founders upon our precedents, and it cannot prevail unless those precedents are overruled by the court sitting en banc.

*McCamey, supra*, 886 A.2d at 548 (emphasis in original).

■ We are now presented with that opportunity. In light of the humanitarian nature of the statute, we hold, in cases involving physical-mental claims, that the objective test is inconsistent with the stat-

ute's principal purpose of compensating employees who prove a connection between a disability and their work. Accordingly, its use must be overturned. Further, just as the aggravation rule in purely physical claims stems from the general principle that an employer must take an employee as it finds him or her, so too should the aggravation rule apply in physical-mental claims without requiring the employee to point to a hypothetical third person—an additional, heightened burden that is necessarily speculative and unnecessary within the context of physical-mental claims where the work-related cause is distinct. Alternatively, if the psychological injury is tied not to the work-related accident, but rather a physical injury that itself arose from the work-related accident, the reviewing body could analyze it as a subsequently occurring injury that could be causally tied to the injury sustained in the workplace accident. Once complainant has established a compensable primary injury (either through the presumption or testimony), the necessary causal connection standard is enunciated in *Brown, supra*, 700 A.2d at 791–92.

DOES's most-recent attempt to elucidate the objective test further reveals the test's flaws and demonstrates that DOES has expanded its applicability beyond a general concern for objectivity to a test that is practically impossible for someone with a predisposition of psychological problems to meet. In *West v. Washington Hosp. Ctr.*, the Compensation Review Board ("Board") squarely confronted "whether a psychological condition claimed to be the consequence or medical sequelae of a physical injury arising out of and in the course of employment, rather than the result of workplace stress, must meet the same standard for invoking the presumption of compensability under the Act as a psychological injury alleged to have result-

ed from workplace stress without a physical injury." CRB (Dir.Dkt.) No. 99–97, *6 (Aug. 5, 2005).[18] In *West*, the claimant suffered a back injury in a slip-and-fall accident at work and eventually developed chronic depression which she claimed was connected to the accident. *Id.* at *2. The hearing examiner declined to apply the *Dailey* test, believing it to be unnecessary in the context of a physical accident, and instead applied the subsequent medical injury causation standard from *Whittaker v. District of Columbia Dep't of Employment Servs.*, supra note 3, 668 A.2d at 844. *West, supra,* at **3–4. On review, the Board examined post-*Dailey* cases, including cases wherein the Director or this court applied the *Dailey* objective test to physical-mental claims. The Board conceded that *Dailey* involved a claim involving job stress, rather than a physical accident, but asserted that the test applied to physical-mental claims as well:

> [I]t would require an overly restrictive reading of *Dailey*, and a misapplication of the body of law that *Dailey* represents, to limit the standard enunciated therein to job stress induced emotional and psychological claims only.... It is the nature of the injury asserted (*i.e.* emotional and/or psychological injury), rather than the conditions of the workplace environment, that warrants application of the *Dailey* standard. This is because mental and emotional injury claims are, as the Director explained, inherently more difficult to objectively determine than are claims of physical injury.

*West, supra,* at **12–13. As support, the Board cites to the Director's statement in *Dailey* that " '[m]ental injury claims are more difficult because of the inherent difficulties of objectively determining the existence of an injury *and its source.*' " *Id.* at

*13 (quoting *Dailey, supra,* at *15) (emphasis added). Our reading of the Agency's decisions and our own cases, however, suggests that it is not the fact of injury that is elusive, it is the cause of the injury and the determination of whether that causal event is work-related—a concern included in the italicized portion of *Dailey* referenced above, but neglected in *West.* Instead, *West* reflects a skepticism of whether the employee suffers an injury at all.

The Board goes on to set forth its view of *Dailey's* requirements:

> [T]he *Dailey* standard may be satisfied notwithstanding the lack of evidence showing that the psychological or emotional injury sustained by the claimant would have similarly resulted to a non-predisposed individual of normal sensibilities. Required in such instances is evidence as to the nature of the employment-related physical injury sustained, that the claimant's psychological/emotional impairment is at least partially attributable to the sustained physical injury or its aftereffects, and that the claimant was not predisposed to the emotional/psychological injury of which he/she complains.

*West, supra,* at **28–29. Lest there be any doubt as to the Board's view of the importance of the predisposition element, the Board reiterated, "[i]t is not, however, the lack of evidence of predisposition that is required, *but the affirmative showing of evidence that Respondent was not predisposed that is required.*" *Id.* at 29 (emphasis added). As an example of the potential application of this rule, the Board had earlier cited a case where the claimant had met the objective standard by establishing through medical evidence that the claimant was not pre-disposed to the emo-

18. Review of this case is currently pending before this court.

tional injury she suffered. *See West, supra,* at \*18 n. 9 (citing *Aycock v. Am. Assoc. of Retired Persons,* Dir. Dkt. No. 01–30 (Jan. 15, 2002)).

This reformulation of the *Dailey* test exposes its fatal flaw. The shift in focus from the objective work conditions to the individual person and his or her predisposition to injury led not only to the necessity of speculating about hypothetical "normal" employees, it has led inexorably to the conclusion that persons with pre-existing psychological conditions *cannot* recover disability benefits if they suffer from the aggravation of their preexisting condition. This is directly antithetical to the well-established aggravation rule, against the well-established principle that the employer must take the employee as it finds him or her, and against the principal purpose of the statute to compensate employees for injuries they can prove are related to employment. Further, it is contrary to this court's admonition in *Spartin* that the objective test must permit those predisposed to emotional conditions to receive compensation if they have met their burden of proof or else it would contravene the Act.

### E. *Other jurisdictions' tests regarding psychological injuries within the context of physical-mental claims.*

In *Spartin,* this court viewed *Dailey* as fitting "within the modern trend to compensate workers for emotional injury caused by job stress," and further noted that Professor Larson advocated a form of an objective test for mental-mental claims involving job stress. *See Spartin, supra,* 584 A.2d at 569. Thus, this court has turned to outside jurisdictions for guidance on these issues. Secondary sources reviewing case law from around the country confirm that the compensability of emotional injuries stemming from physical ac-

cidents is uniformly accepted. Larson states,

> [W]hen there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis, conversion hysteria, or hysterical paralysis, it is now *uniformly held* that the full disability including the effects of the neurosis is compensable. Dozens of cases, involving almost every conceivable kind of neurotic, psychotic, psychosomatic, depressive, or hysterical symptom, functional overlay, or personality disorder, have accepted this rule.

3 LARSON'S, *supra,* at § 56.03[1] (emphasis added); *see also id.* at § 53.06D (compiling cases nationwide that accept physical-mental claims). Further, "[a]s in other connections, a preexisting weakness in the form of a neurotic tendency does not lessen the compensability of an injury which precipitates a disabling neurosis." *Id.* at § 56.03[2]; *see also* 3 LARSON'S, *supra,* at § 56.04[3] (discussing the aggravation rule and noting, "[t]here appears to be no reported decision in which compensation was denied in this type of case solely because there was a preexisting neurotic tendency").

Other commentators agree: "Courts uniformly have held that a mental injury which implicates the existence of a physical impact stimulus or a physical injury satisfies the personal injury requirement [of workers' compensation laws]. The analogy to negligence cases concerning mental injuries is obvious. The existence of an objective, traumatic, work connected physical impact or injury provides an intuitive guarantee that the mental disorder is genuine and that the employment genuinely caused it." Lawrence Joseph, *The Causation Issue in Workers' Compensation Mental Disability Cases: an Analysis, So-*

*lutions, and a Perspective*, 36 VAND. L.REV. 263, 288 (1983); *see id.* at 288 n. 104 (citing supportive cases). Joseph further explains how courts can appropriately deal with predisposition:

> Courts generally have recognized—consistent with present medical knowledge—that an individual's personal psychological disposition in part causes employment related mental injuries. Accordingly, courts have interpreted the arise-out-of employment requirement to account for this element of personal susceptibility. This interpretation arises from the axiom in workers' compensation law that employers must take employees as they are—with their personal bodily and mental deficiencies. Therefore, the appropriate arise-out-of employment inquiry in mental disability cases is whether the workers' employment aggravates, accelerates, or combines with his personal mental disposition to produce his disability.

*Id.* at 299.

Both Larson and Joseph cite to numerous cases throughout the country that recognize physical-mental claims without imposition of an objective test. A review of some of them demonstrates that while courts may apply slightly different language in the causation standard, they are straightforward tests that connect disability to the accident. For example, in *Gartrell v. Dep't of Correction*, 259 Conn. 29, 787 A.2d 541, 548–49 (C2002), the Connecticut Supreme Court agreed with the plaintiff that the aggravation of a preexisting psychiatric condition was compensable as a distinct injury when it was the direct consequence of a work-related physical injury;

the court so held in part in recognition of "a fundamental tenet of workers' compensation law ... that an employer takes the employee in the state of health in which if finds the employee." *Id.* at 549 (internal quotation omitted). Regarding a causal standard, the court held that the physical injury had to be a "but for" cause of the aggravation. *Id.*

In Illinois, psychological disabilities are compensable where a physical injury is a causative factor:

> [A] disability caused by a neurosis is compensable if it resulted from an accidental injury. The work-related accident need not be the sole causative factor of the neurosis but need be only a causative factor of the condition. Further, even where the psychological condition was a preexisting one, if the work-related accident aggravated the condition, it is compensable.

*Amoco Oil Co. v. Industrial Comm'n*, 218 Ill.App.3d 737, 161 Ill.Dec. 397, 578 N.E.2d 1043, 1050 (1991) (internal citations omitted).[19] Illinois's ready compensation of physical-mental claims dates back at least to 1924. *See United States Fuel Co. v. Industrial Comm'n*, 313 Ill. 590, 145 N.E. 122, 123 (1924) ("It is immaterial whether this [permanent incapacity to work] is caused by a physical injury or a mental disorder resulting from the injury.").

The case of *Love v. McDonald's Restaurant* illustrates an example of another court that struggled to reach a proper standard in physical-mental claims. *See* 13 Kan.App.2d 397, 771 P.2d 557 (1989). In *Love*, the claimant fell down some stairs at work and later claimed that her neurosis was connected to that workplace accident. *Id.* at 558. Kansas's early cases

19. *Amoco* features similarities to Ms. McCamey's situation. In *Amoco*, the claimant had a pre-existing psychological condition, but the condition was never so disabling as to prevent

him from working. *See* 161 Ill.Dec. 397, 578 N.E.2d at 1050. The claimant's mental condition, however, deteriorated after the work-related accident. *Id.*

had involved physical injuries, wherein the court applied the rule that the neurosis was compensable if directly traceable to the physical injury. *Id.* The court then considered mental-mental claims and added a causal element that sought to link the workplace to the ultimate disability. *Id.* This was because the statute specifically called for "personal injury by accident;" thus, absent the accident, the court imposed a causal connection requirement linking the claimed emotional disability to the workplace environment—a clearly distinct test for the distinct situation presented by gradual stress mental-mental claims. However, in a later case, the court then conflated the two tests, such that "traumatic neurosis was compensable *only if* the mental disability [was] directly traceable to a work-related physical injury *and* could also be causally connected to the conditions and requirements of claimant's job." *Id.* at 559 (emphasis in *Love*; internal quotation and citation omitted). The appeals court in *Love* rejected the conflated test and returned to the straightforward requirement that the disability be directly traceable to a workplace accident. *Id.* at 560.

This case further supports the distinction between physical-mental and mental-mental claims. The Kansas courts only created a new causal test in the absence of the physical accident because it was only then that work-connectedness was in doubt. If the employee proves the disability and proves that it is connected to a physical workplace accident ("directly traceable" in Kansas; "causative factor" in Illinois; "but for" in Connecticut), then there is no problem establishing that the disability arose out of employment.

### III.

The objective test as applied cannot be reconciled with the clear language of ei-

ther the WCA or the CMPA, both of which provide in straightforward language that the Acts compensate workers for injuries *they* suffer on the job. The WCA covers "[t]he injury or death of an employee that occurs in the District of Columbia if the employee performed work for the employer, at the time of the injury or death, while in the District of Columbia," D.C.Code § 32–1503(a)(1), while the CMPA covers "the disability or death of an employee resulting from personal injury sustained while in the performance of his or her duty," D.C.Code § 1–623.02. Further, the test as applied fails to meet the humanitarian purpose of the statute, it neglects to award compensation in arguable cases, and it is contrary to the aggravation rule and the general principle that employers must accept employees as they find them. Moreover, as demonstrated above, it is simply unnecessary in physical-mental cases because the accident supplies the necessary objective work connection. Accordingly, the test must be overturned.

 Though the workplace accident supplies the necessary and objective workplace connection, the claimant must still ultimately prove that his or her disability is causally connected to that accident. While a review of decisions from other jurisdictions reveals different terminology for defining causation in this context, those jurisdictions do not offer any particular reason for adopting any particular test (*e.g.,* "but for," "causative factor," "directly traceable"). Thus, we hold that it is appropriate to apply the causal standards seen throughout D.C. workers' compensation cases. In cases where the statutory presumption is applicable, the claimant must show that the physical accident had the potential of *resulting in or contributing to* the psychological injury. *See Smith, supra,* 934 A.2d at 435 (quoting *Mexicano v. District of Columbia Dep't of*

*Employment Servs.*, 806 A.2d 198, 204 (D.C.2002)) (" 'To benefit from the statutory presumption, the employee need only show some evidence of a disability and a work-related event or activity which has the potential of resulting in or contributing to the disability.' "). Where the presumption is either inapplicable or has been rebutted, the burden falls on the claimant to prove by a preponderance of the evidence that the physical accident caused or contributed to the psychological injury. *See Washington Post v. District of Columbia Dep't of Employment Servs.*, 852 A.2d 909, 911 (D.C.2004). In determining whether a claimant has met his or her burden, a hearing examiner must weigh and consider the evidence as well as make credibility determinations. In this regard, the examiner may of course consider the reasonableness of the testimony and whether or not particular testimony has been contradicted or corroborated by other evidence.

While neither the *West* case nor the application of the objective test to mental-mental claims is squarely before the court in this case, our analysis in this case necessarily affects the scope of the objective standard in mental-mental cases as well. The reason that the objective test is unnecessary in the physical-mental context—that the physical accident supplies the necessary work-connection-flows back to *Dailey's* conflation of the desire for objective verification of a work-related event with the Director's concern that an employee's predisposition to mental injury would make the determination that the disability was caused by workplace stress more difficult. In some mental-mental claims, this objectively verifiable work connection may be far less apparent; thus, the imposition of a carefully crafted test to establish the necessary connection between mental inju-

ry and work may be appropriate for such cases. We do not purport to say here what such a test should be. However, any test that prevents persons predisposed to psychological injury from recovering in all cases is inconsistent with the legislative history and humanitarian purpose of the D.C. WCA and CMPA. Accordingly, if the Board decides that a special test for mental-mental claims remains desirable, it must be one focused purely on verifying the factual reality of stressors in the workplace environment, rather than one requiring the claimant to prove that he or she was not predisposed to psychological injury or illness, or that a hypothetical average or healthy person would have suffered a similar psychological injury, before recovery is authorized.[20]

Although we defer to an Agency's reasonable interpretation of the statute it is empowered to administer, we cannot defer when the interpretation is inconsistent with the language and purpose of the statute. Because the objective test, as applied to physical-mental claims, is inconsistent with the language of the WCA and the CMPA and is contrary to the purposes underlying the District's workers' compensation laws, it is unreasonable and therefore its use must be overturned. Accordingly, the decision of the Director is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

**20.** The issue is discussed at length in LARSON, *supra,* at § 56.06.