Jamil F. MUHAMMAD, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent,

and

Eastern Electric and Zurich American
Insurance Company, Intervenors.

No. 10–AA–1049.

District of Columbia Court of Appeals.

Argued Oct. 4, 2011.

Decided Jan. 5, 2012.

Benjamin T. Boscolo, Greenbelt, MD, with whom Jason C. Zappasodi was on the brief, for petitioner.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and John L. Davie, Special Assistant Attorney General, filed a statement in lieu of brief for respondent.

Mark T. Krause, Baltimore, MD, with whom Charles J. O'Hara was on the brief, for intervenors.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and SCHWELB, Senior Judge.

FISHER, Associate Judge:

The District of Columbia Department of Employment Services denied workers' compensation benefits to Jamil Muhammad, holding that his psychological injury did not arise out of and in the course of his employment. Because the Compensation Review Board's decision and the underlying compensation order were based on an error of law, we reverse and remand for further proceedings.

## I. Factual Background

On March 1, 2002, Jamil Muhammad was working as an electrician's helper for Eastern Electric, Inc., in the District of Columbia. While attempting to lift several heavy cables, Mr. Muhammad hurt his lower back, requiring orthopedic treatment. Eastern Electric agreed that this initial physical injury was compensable, and Mr. Muhammad received temporary total disability benefits stemming from the injury.

Three years later, Eastern Electric enrolled Mr. Muhammad in vocational rehabilitation to assist him in finding employment consistent with his skills and physical disability. In the past, Mr. Muhammad had held only physically demanding jobs, but his injury now limited him to performing sedentary work. He had few transferable skills; tested poorly in reading, spelling, and arithmetic; and lacked a high school diploma. Petitioner was "a reluctant and, at times, an oppositional partici-

pant in vocational rehabilitation." The case manager explained that Mr. Muhammad "had a mindset that he was totally and completely disabled and couldn't work and was just consumed by that much pain that there'd be no way he could work." Nevertheless, the ALJ found in his first compensation order that "there is nothing in [the vocational case manager's] cumulative reports to suggest [that Mr. Muhammad] failed to reasonably cooperate with the vocational efforts.... [A] finding of claimant's non-cooperation with vocational rehabilitation cannot be sustained."

In April 2006, following nearly a year of unsuccessful vocational counseling, rehabilitation efforts were terminated. Shortly thereafter, Mr. Muhammad's treating physician recommended that he begin seeing a psychiatrist. Mr. Muhammad met with Dr. Kenneth Smothers for a psychiatric evaluation in September of that year. After three consultations, Dr. Smothers diagnosed Mr. Muhammad with a mental illness caused by his 2002 workplace injury.[1] Mr. Muhammad's symptoms included "severely depressed mood, bouts of anxiety, 'anger flare-ups,' impaired concentration, and social and vocational dysfunction." Because of petitioner's "debilitating depression," Dr. Smothers prescribed psychotherapy, psychotropic medication, aggressive pain management, and continued leave from the workplace.

Eastern Electric and its insurer sought an independent medical examination and arranged for Mr. Muhammad to be examined by Dr. Brian Schulman. Following a comprehensive psychiatric evaluation in October 2006, Dr. Schulman also diagnosed Mr. Muhammad with a mental illness, variously described as a Depressive Disorder Not Otherwise Specified ("NOS"), an Adjustment Disorder, and a Personality Disorder NOS. Dr. Schulman recommended "psychiatric treatment," possibly including "antipsychotic medication," "to prevent a further deterioration of Mr. Muhammad's behavior." "The cause of this disorder," he determined, "is [Mr. Muhammad's] limited coping response to the challenges imposed by vocational rehabilitation." In a sworn deposition taken in December 2006, Dr. Schulman testified that, due to his mental illness, Mr. Muhammad "absolutely should not" proceed with "vocational rehabilitation."

Following a remand by the Compensation Review Board ("Board"), Dr. Schulman was asked to reconsider his opinion in light of the McCamey standard.[2] He concluded, to "a reasonable degree of medical probability, [that] Mr. Muhammad did not develop a mental disorder as a consequence of the physical injury he sustained on March 1, 2002."[3] Rather, Mr. Muham-

1. According to Dr. Smothers, "Mr. Muhammad's depression and associated symptoms [were] causally and temporally related to his workplace injury and resulting and now chronic pains. Over the past four years, his pain has worsened and feeling of hopelessness has increased. It is well known that chronic pain adversely affects mood and a pathological mood can cause and exacerbate pain."

2. *McCamey v. District of Columbia Dep't of Employment Servs.*, 947 A.2d 1191 (D.C.2008) (en banc).

3. Dr. Schulman explained that "there is no credible medical evidence creating a nexus between Mr. Muhammad's physical injury, sustained on March 1, 2002, and the mental and behavioral disturbance manifest during and following his interactions with the vocational consultants in the latter part of 2005, almost three and a half years after the subject event. Prior to his referral to vocational rehabilitation, there is no reference in the submitted records of any treating or evaluating physician diagnosing Mr. Muhammad with a mental disorder or related mental impairment to the subject event."

mad manifested the mental condition "as a consequence to his participation in vocational rehabilitation, which he felt was inappropriate; as well as his inability to tolerate the opinions of others who did not perceive of him, as he did, as being totally disabled." "I concluded that Mr. Muhammad's mental and behavioral disturbance, which was clearly manifest in my office, as well as with the vocational counselors, was directly related to the efforts to proceed with vocational rehabilitation."

After receiving evaluations from both psychiatrists, Mr. Muhammad petitioned for permanent total disability benefits. The Administrative Law Judge ("ALJ") reviewed Mr. Muhammad's psychiatric reports and "credit[ed] the findings of Dr. Shulman [sic] with significant weight." The ALJ concluded that Mr. Muhammad suffered from a depression disorder and an adjustment disorder and that, as "Dr. Shulman unequivocally testified[,] ... claimant's behavioral or mood disorder 'was most dramatically amplified by vocational rehabilitation efforts.'" Nevertheless, the ALJ denied Mr. Muhammad's claim in a Compensation Order dated November 30, 2007, after concluding that his "psychiatric injury is not medically causally related to the March 1, 2002 [back] injury." After remanding twice, the Board ultimately upheld the ALJ's order denying compensation. Mr. Muhammad filed a petition for review.

## II. Standard of Review

■■■ "This court reviews [Department of Employment Services] decisions to determine whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Bentt v. District of Columbia Dep't of Employment Servs.*, 979 A.2d 1226, 1231 (D.C.2009) (quoting *Georgetown Univ. v. District of*

*Columbia Dep't of Employment Servs.*, 971 A.2d 909, 915 (D.C.2009)). On questions of fact, we review the record for substantial evidence supporting the Board's conclusions. "Under the 'substantial evidence test,' we will affirm an agency decision when (1) the agency makes findings of fact on all material contested issues; (2) these findings rationally lead to conclusions of law that are legally sufficient, under the governing statute, to support the agency's decision; and (3) each finding is supported by evidence sufficient to convince reasonable minds of its adequacy." *Ramey v. District of Columbia Dep't of Employment Servs.*, 997 A.2d 694, 698 (D.C.2010) (citing *Clark v. District of Columbia Dep't of Employment Servs.*, 743 A.2d 722, 726 (D.C.2000)). "Questions of law ... are reviewed *de novo.*" *McCamey v. District of Columbia Dep't of Employment Servs.*, 947 A.2d 1191, 1196 (D.C.2008) (en banc); *accord, Kuri Bros., Inc. v. District of Columbia Bd. of Zoning Adjustment*, 891 A.2d 241, 245 (D.C.2006) ("[A]lthough we accord weight to the agency's construction of the statutes which it administers, the ultimate responsibility for deciding questions of law is assigned to this court.").

## III. The Changing Legal Landscape

■■ The Workers' Compensation Act provides benefits to compensate for wages lost as a result of "accidental injury or death arising out of and in the course of employment." *See* D.C.Code § 32–1501(12) (2001). Therefore, a valid claim based on lost wages must include three basic elements: (1) an accidental injury, (2) an actual workplace condition that could have caused the injury, and (3) a causal link between the injury and the workplace. Where the injury is psychological, we review the claim as either a

"physical-mental" [4] case under the principles of *McCamey*, 947 A.2d 1191, or as a "mental-mental" [5] case under the principles of *Ramey*, 997 A.2d 694.

Over the five years in which Mr. Muhammad has attempted to resolve his case through the workers' compensation system, the legal landscape for claims of psychological injury has changed dramatically. When Mr. Muhammad originally filed his claim, this jurisdiction applied an "objective standard" requiring "the claimant [to] show[ ] that the actual working conditions could have caused similar emotional injury in a person who was not significantly predisposed to such injury." *Dailey v. 3M Co.*, H & AS No. 85–259, 1988 D.C. Wrk. Comp. LEXIS 1, at *8 (D.C. Dep't of Employment Servs. May 19, 1988); *see also Porter v. District of Columbia Dep't of Employment Servs.*, 625 A.2d 886, 889 (D.C.1993) (endorsing the objective test). However, in *McCamey*, a 2008 en banc decision, we rejected this "objective standard," which delves into an "employee's particular susceptibilities," as contrary to the fundamental, humanitarian purpose of the Workers' Compensation Act. 947 A.2d at 1206, 1209. Two years later, in *Ramey*, we upheld the Board's decision to "adopt[ ] the test announced by this court in *McCamey* for use in physical-mental cases, for application in mental-mental cases." 997 A.2d at 700 (reviewing the Board's mental-mental rule announced in *Ramey v. Potomac Electric Power Co.*, CRB No. 06–38, 2008 WL 3338467 (D.C. Dep't of Employment Servs. July 24, 2008)).

In 2008, we also decided *Nixon v. District of Columbia Dep't of Employment Servs.*, which discussed whether an injury sustained as a result of vocational rehabilitation may be considered as "aris[ing] both 'out of and in the course of employment.'" 954 A.2d 1016, 1024 (D.C.2008) (quoting *McCamey*, 947 A.2d at 1200) (other citations omitted). In *Nixon*, we remanded for a determination of whether a claim flowing from vocational rehabilitation "might be covered as involving what Professor Larson refers to as a 'quasi-course of employment' injury." *Id.* at 1025 (quoting 1 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 10.05 (2008)). Quasi-course of employment activities are "activities undertaken by the employee following upon his or her injury which, although they take place outside the time and space limits of the employment, and would not be considered employment activities for usual purposes, are nevertheless related to the employment in the sense that they are necessary or reasonable activities that would not have been undertaken *but for* the compensable injury." *Id.* (other citations omitted, emphasis added). Nevertheless, "we express[ed] *no view as to* whether Nixon's medical benefits claim [wa]s compensable under the [Comprehensive Merit Personnel Act], but instead remand[ed] the case so that [the Board] [could] consider in the first instance what appears to be a question of first impression in this jurisdiction[.]" *Nixon*, 954 A.2d at 1026.

On remand in *Nixon*, the ALJ determined that where the "[e]mployer was under a statutory duty to provide vocational rehabilitation[ and the] [c]laimant was under a similar duty to participate," the resulting injury may be compensable as a

---

4. In physical-mental cases, the claimant alleges that a physical workplace injury caused a mental injury. *See McCamey*, 947 A.2d at 1194 (alleging head injury led to depression).

5. In mental-mental cases, the claimant alleges that an emotionally-traumatic workplace event or stressor caused a mental injury. *See Ramey*, 997 A.2d at 696 (alleging work embarrassment led to post-traumatic stress disorder).

workplace injury. *Nixon v. District of Columbia Housing Authority*, CRB No. 06–80(R), 2009 WL 1689630, at *6 (D.C. Dep't of Employment Servs. May 5, 2009). Although the ALJ accepted the quasi-course of employment doctrine, the Board did not review that order and, as far as we are aware, it has never decided the question presented in *Nixon*.

## IV. The Board's Legal Analysis

### A. The Board's Decision

In his first compensation order, dated November 2007, the ALJ in Mr. Muhammad's case applied the so-called *Dailey* objective test and denied benefits, determining that petitioner's "psychological symptoms" were "unrelated to the original work injury" because they were not "typical to that of the average, emotionally non-predisposed individual." Because our 2008 decision in *McCamey* overruled this portion of *Dailey*, the Board remanded to the ALJ for reconsideration. But when the ALJ issued a revised order, he again denied benefits, reasoning that Mr. Muhammad's psychological illness did not "stem[ ] from the March 1, 2002 injury" as "the record contains no evidence of a diagnosis related to mood disorder or depression prior to his referral for vocational rehabilitation in the latter part of 2005."

On subsequent review, the Board again remanded the case, this time to consider petitioner's "reaction to the employer-initiated vocational rehabilitation" in light of the intervening decisions of *Ramey*, 997 A.2d 694; *Nixon*, 954 A.2d 1016; and *Jones v. District of Columbia Office of Unified Communications*, CRB No. 09-049, 2009 WL 1651413 (D.C. Dep't of Employment Servs. May 12, 2009). In this second remand order, after citing and describing the compensability tests of *McCamey* and *Ramey*, the Board instructed the ALJ in a footnote:

In *Jones*, we held that in a mental-mental claim an ALJ must make two determinations: (1) verifying the factual reality of the stressor (is the stressor real and not fabricated) and if so, (2) determining if the stressor caused the claimed psychological injury or did the psychological injury result from a *strictly personal reaction* by the claimant. *See also Georgetown University v. DOES*, [971 A.2d 909 (D.C.2009) ].

(Emphasis added.)

The ALJ attempted to apply this test, focusing on "factors inherent to [Mr. Muhammad's] personal dispositions." On its third review of Mr. Muhammad's case, the Board upheld the legal conclusions of the ALJ, determining that he had appropriately "analyzed the evidence in light of the two-part test enunciated in *Ramey* [,] in *McCamey* [,] and in *Jones* [,] requir[ing] an ALJ ... [to] determine if the stressor caused the claimed psychological injury or if the psychological injury resulted from a *strictly personal reaction*." *Muhammad v. Eastern Electric*, CRB No. 09–132, 2010 WL 3205411, at *3 (D.C. Dep't of Employment Servs. July 26, 2010) (emphasis added).

### B. The "Strictly Personal Reaction" Test Was Error

Contrary to the Board's assertion, its "strictly personal reaction" formulation of the governing test is not supported by *Ramey*, *McCamey*, or *Jones*. Rather, these cases stand for the opposite proposition—"that employers must accept employees as they find them." *McCamey*, 947 A.2d at 1213. Although in the instant case the Board cited our decision in *McCamey*, its focus on the claimant's "strictly personal reaction" closely resembles language from the very cases *McCamey* overruled. *See Porter*, 625 A.2d at 889 (when an emotional injury is

claimed, Director may properly apply a rule for causation that focuses "on the objective conditions of the job and their effect on the 'normal employee' not predisposed to the injury by a mental disorder"); *Dailey*, 1988 D.C. Wrk. Comp. LEXIS at *8 ("The objective standard is satisfied where the claimant shows that the actual working conditions could have caused similar emotional injury in a person who was not significantly predisposed to such injury.").[6]

The controlling standard, first enunciated in *McCamey* and then adopted in *Ramey* and *Jones*, is that the Workers' Compensation Act neither requires, nor permits, use of an objective test under which "an employee seeking compensation for psychological injuries [must] show that an average person not predisposed to such injury would have suffered a similar injury." *McCamey*, 947 A.2d at 1201.

### C. Neither the ALJ nor the Board Gave Proper Consideration to *Nixon*

In its second remand order, the Board instructed that "in the event that the ALJ decides that the Petitioner's psychological problems were not caused by work-accident but by his reaction to the employer-initiated vocational rehabilitation, the ALJ should consider this claim in accordance with *Nixon*." Both of these prerequisites seem to be satisfied. The ALJ wrote that "it cannot be concluded claimant's alleged mood disorder and depression stemmed from the work incident of March 1, 2002," and he had already accepted the testimony of Dr. Schulman "that claimant's behavioral or mood disorder 'was most dramatically amplified by vocational rehabilitation ef-

forts.'" Nevertheless, after describing the facts of *Nixon*, the ALJ concluded that "[c]laimant's alleged psychological injuries . . . were *not* the direct and natural consequences of employer-instituted vocational rehabilitation activities." (Emphasis added.) Immediately after announcing this conclusion, the ALJ then stated the cursory reasoning explaining it: "the injury in *Nixon*, [954 A.2d 1016], *vis-a-vis* the one alleged in the instant case, being physical in the former and mental in the latter, seem patently distinct to infer any favorable analogy therefrom."

Because the ALJ did not meaningfully address the question identified in *Nixon*, and failed to articulate a basis for distinguishing between physical injuries and mental injuries in this context, we need not defer to his finding. On subsequent review the Board did not acknowledge these defects in the ALJ's reasoning. Rather, rejecting petitioner's argument that the ALJ had failed "to apply the rationale in *Nixon*," the Board stated that "[t]he ALJ's conclusion that Petitioner's psychological problems stem from his own reaction to vocational rehabilitation rather than from participation in a required activity is supported by substantial evidence." We have already explained why this focus on petitioner's "own reaction" was error.

### V. Two Modes of Analysis

The Board analyzed Mr. Muhammad's case under the principles articulated in *Ramey* for mental-mental claims. However, the principles of *McCamey* may be equally applicable. Both parties agree that Mr. Muhammad initially suffered a compensable physical injury arising out of

---

6. The Board also cited our decision in *Ramey* and its own decision in *Jones* as bases for its "strictly personal reaction" test. But both *Ramey* and *Jones* rejected the *Dailey* objective standard. *See Ramey*, 997 A.2d at 700 (not-

ing the Board's "adopt[ion of] the test announced by this court in *McCamey*"); *Jones*, 2009 WL 1651413, at *6 ("The above quoted language from *Ramey*, therefore, is the standard that should be applied on remand.").

his employment—he injured his lower back in 2002 while lifting cables on the job. As a result of this injury, he was required to attend vocational rehabilitation, which he alleges caused a psychological injury. Using the logic of *Nixon,* vocational rehabilitation could be viewed as a link in the causal chain leading back to the original physical injury (*McCamey*), or, alternatively, viewed as a new "quasi-course of employment" stressor causing emotional injury (*Ramey*). Because the Board has not yet determined whether to adopt the quasi-course of employment theory described in *Nixon,* we remand for further consideration. We also take this opportunity to remind the agency of certain governing principles that must be applied to the record in this case and to emphasize the need for greater clarity of analysis.

### A. *Ramey* Analysis

#### 1. Actual Injury and Workplace Conditions

Mr. Muhammad has met his burden under *Ramey* of showing an actual psychological injury. Both Mr. Muhammad's doctor and the employer's doctor agreed that he developed a genuine mental illness.[7] Accordingly, in his compensation orders, the ALJ repeatedly described Mr. Muhammad as suffering from mental and behavioral disorders.

 Next, "[t]he ALJ . . . must make findings that the workplace conditions or

events existed or occurred, and must make findings on credibility." *Ramey,* 997 A.2d at 699. Although we have rejected the use of an objective standard for evaluating an individual's *reaction* to workplace conditions, we of course did not eliminate the requirement that the workplace conditions that a petitioner asserts caused the injury must exist in reality. *See McCamey,* 947 A.2d at 1214; *Jones,* 2009 WL 1651413, at *6 (Board remanded for, among other things, a determination of whether the alleged stressors "were in reality part of the work place environment, as opposed to fabrications or imaginings of Petitioner"). Nevertheless we have made clear that in mental-mental cases a test for the existence of actual workplace stressors must be one "*verifying the factual reality of stressors* in the workplace environment, rather than one requiring the claimant to prove that . . . a hypothetical average or healthy person would have suffered a similar psychological injury. . . ." *McCamey,* 947 A.2d at 1214 (emphasis added).

In creating its two-part test,[8] the Board perhaps intended to emphasize that the alleged stressors must actually exist in the workplace. But the Board accomplished this with the first prong of its test, requiring the ALJ to verify "the factual reality of the stressor (is the stressor real and not fabricated). . . ." (In accordance with *Jones,* the Board might well have expanded this prong to say "real and not fabricat-

---

7. There is no evidence in the record before us (certainly no substantial evidence) that petitioner was malingering, or that he suffered from something less than a clinically-diagnosable mental condition. Nor is there any evidence that his injury was the "result of [his] own misconduct or intentions." *Nixon,* 2009 WL 1689630, at *3; *see* D.C.Code § 32–1521 (2001) (It is "presumed, in the absence of evidence to the contrary . . . [that] the injury was not occasioned by the willful intention of the injured employee[.]").

8. Requiring "that in a mental-mental claim an ALJ must make two determinations: (1) verifying the factual reality of the stressor (is the stressor real and not fabricated) and if so, (2) determining if the stressor caused the claimed psychological injury or did the psychological injury result from a *strictly personal reaction* by the claimant. *See also Georgetown University v. DOES,* [971 A.2d 909 (D.C. 2009) ]." (Emphasis added.)

ed or imagined by the claimant.").[9] When it expanded the inquiry to ask whether "the psychological injury result[ed] from a *strictly personal reaction* by the claimant," the Board only added confusion.

This confusion was evident when the ALJ attempted to apply the test. Mr. Muhammad claimed that the real stressor causing his mental injury was "employer-instituted vocational rehabilitation activities," which had proved to be particularly frustrating and stressful. But in his compensation order, the ALJ wrote that "the record discloses no specific stressors that caused claimant's mood depression; rather it was his own reaction to the protocols of job placement that cumulatively produced the alleged depression[.]" Perhaps by this sentence the ALJ meant to deny the factual reality of the alleged workplace stressor.[10] If so, the ALJ's analysis indicates he reached this conclusion not by examining the actual conditions of Mr. Muhammad's vocational rehabilitation, but by judging his subjective *reactions* to vocational rehabilitation. This an ALJ may not do. *McCamey*, 947 A.2d at 1214.

## 2. Causation

When the Board referred to the claimant's "strictly personal reaction," perhaps it was attempting to describe the fundamental requirement that the injury arise out of—be causally linked to—a claimant's employment. This inference is supported by the Board's reliance on *Jones*. There, the Board quoted Professor Larson, who noted that there are some injuries so thoroughly disconnected from the workplace that they cannot be said to "aris[e] out of or in the course of employment." *See* 1 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 4.02 (2011) (Some risks have "origins of harm so clearly personal that, even if they take effect while the employee is on the job, they could not possibly be attributed to the employment.").[11] Such an inference about the Board's intention is strengthened by its citation to *Georgetown University*, where we recognized that "idiopathic injuries" may "result[ ] from some disease or infirmity that is strictly personal to the employee and unrelated to his employment.'" *Georgetown Univ.*, 971 A.2d at 913 n. 1 (quoting *Ledbetter v. Michigan Carton Co.*, 74 Mich.App. 330, 253 N.W.2d 753, 754 (1977) (other citations omitted)); *see also id.* at 920 n. 10 (again using the words "strictly personal to the employee").

However, in *McCamey* we rejected any test that would shift the focus "from an objective examination of the workplace environment to one that examine[s] both the environment and the employee's particular susceptibilities." *McCamey*, 947 A.2d at 1206. As demonstrated above, the Board's "strictly personal *reaction* " test impermissibly shifts the inquiry away from whether

---

9. The Board also noted that "the ALJ remains free to determine whether, from an objective standpoint, the conditions causing his alleged psychological injuries were the result of 'persecution' or 'punishment' from the vocational rehabilitation activities, or were the result of Petitioner's subjective perception that the vocational rehabilitation activities amount to 'persecution' or 'punishment.' " This rather opaque directive seems to differentiate between stressors that exist in reality and those that are only imagined.

10. The Board interpreted this statement to mean that "the real stressor is Petitioner's personal and combative reactions to vocational rehabilitation." *Muhammad*, 2010 WL 3205411, at *3.

11. Examples of these risks might include "d[ying] a natural death" or meeting one's "mortal personal enemy," which, although they may happen to occur at the workplace, "cannot be said to have had any causal relation" to the work. 1 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 4.02 (2011).

the claimant's psychological injury "arose out of" a workplace stressor, to whether the claimant *reacted to* that workplace stressor in a typical fashion.

The ALJ made no finding of fact that Mr. Muhammad's psychological injury was unrelated to the workplace. Indeed, he credited the findings of Dr. Schulman, who opined that Mr. Muhammad suffered a mental illness "as a consequence to his participation in vocational rehabilitation," which Mr. Muhammad was required to attend as a result of the March 2002 injury.[12]

## B. *McCamey* Analysis

■ Although *Ramey* provides a valid framework for analyzing this case, the Board also could have treated Mr. Muhammad's situation as a physical-mental case. A primary difference between physical-mental claims and mental-mental claims is that "[i]n the context of physical-mental disabilities, the physical accident is the unexpected occurrence supplying the necessary (and objective) workplace connection." *McCamey,* 947 A.2d at 1208. Thus far, there seems to be no controversy. The parties agree that in 2002 petitioner suffered a compensable physical injury to his back, and the ALJ credited the testimony of Dr. Schulman that Mr. Muhammad suffers from a cognizable mental injury. See *supra,* Part V.A.1.

■ The dispute focuses on whether there is an unbroken "chain of causation" connecting Mr. Muhammad's initial, physical injury to his subsequent mental injury. *See Nixon,* 2009 WL 1689630, at *3. "The rule is that a subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury." *McCamey,* 947 A.2d at 1198, 1209 (citing *Brown v. Dep't of Employment Servs.,* 700 A.2d 787, 791–92 (D.C.1997) (other citation omitted)).

In Mr. Muhammad's case, the ALJ wrote that "it cannot be concluded claimant's alleged mood disorder and depression stemmed from the work incident of March 1, 2002." But as discussed above, *Nixon,* if adopted, would provide this causal link. "It has long been recognized in this jurisdiction that where the initial or primary injury has been shown to have ar[isen] out of and in the course of the employment that every natural consequence which flows from the injury also arises out of the employment." *Nixon,* 2009 WL 1689630, at *3 (citing *Gerdes v. District of Columbia Public Schools,* E.C.A.B. No. 87–9, 1989 DC Wrk. Comp. LEXIS 56 (D.C. Dep't of Employment Servs. August 25, 1989)). Resolving the issue raised in *Nixon* therefore must be a primary focus on remand.

## VI. Conclusion

The Board erred in prescribing a "strictly personal reaction" test and by failing to correct the ALJ's dismissive attitude toward *Nixon.* For these reasons, and because the Board has yet to decide the question presented in *Nixon,* we reverse and remand for further proceedings not inconsistent with this decision.

*So ordered.*

---

12. Dr. Schulman also testified that, in his medical opinion, Mr. Muhammad "did not develop a mental disorder as a consequence of the physical injury he sustained on March 1, 2002." However, given our precedent, we do not treat this statement concerning *legal* causation as determinative. As discussed below, *Nixon* could provide the causal link between the physical injury and the subsequent psychological injury caused by vocational rehabilitation.