Horace E. HENSLEY, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent,

and

Cheechi & Company, et
al., Intervenors.

No. 11–AA–0930.

District of Columbia Court of Appeals.

Submitted March 27, 2012.

Decided Aug. 16, 2012.

John Noble, Washington, DC, for petitioner.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, filed a statement in lieu of brief for respondent.

Alan M. Carlo, for intervenors.

Before GLICKMAN and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

THOMPSON, Associate Judge:

Petitioner Horace Hensley, who has received worker's compensation benefits based on total disability since the late 1980's, sought an additional award requiring his former employer, intervenor Cheechi & Company (the "Employer"), to reimburse his expenses for certain medical, assisted-living, transportation, home at-

tendant, and other services, all of which petitioner claims relate to workplace aggravation (in 1986) of the progressive disease that affects his joints. Petitioner also sought an order establishing his entitlement to payment of a 20% penalty as a result of the Employer's failure to make timely payment of scheduled cost-of-living adjustments ("COLAs") for the period from February 22, 1990, through July 13, 1997.[1] In a February 3, 2010, Compensation Order, an Administrative Law Judge ("ALJ") of the Department of Employment Services ("DOES") rejected petitioner's expense-reimbursement claim, but agreed that petitioner is entitled to payment of the 20% penalty amount. Upon its review of the Compensation Order, the DOES Compensation Review Board (the "Board" or the "CRB"), in a June 29, 2011, Decision and Order, upheld the ALJ's determination denying the expense reimbursement, but reversed the ALJ's determination as to the 20% penalty. Petitioner challenges both of the CRB's rulings. We affirm the CRB's ruling as to petitioner's expense-reimbursement claim, but reverse its ruling as to the 20% penalty and remand on that issue.

## I. Background

There is no dispute that petitioner has suffered from ankylosing spondylitis ("AS"), a progressive, chronic, inflammatory arthritic ailment, since sometime in the 1970's. Petitioner's treating rheumatologist, Dr. Donald Thomas, testified during his March 31, 2004, deposition that AS "begins in the ... joints at the base of the spine ... [t]hen works its way up over many years to involve the whole spine, and often times will affect peripheral joints such as the shoulders and hips and even down to the hands and feet."

In May 1986, petitioner was hired by the Employer as a comptroller, a position that required him to work long hours while sitting at a desk looking at a computer screen. In December 1986, petitioner complained that sitting for such lengthy time periods at work had aggravated his AS, causing him to lose mobility in his spine. Petitioner was found to be temporarily totally disabled in 1987, and, in a 1993 compensation order, was determined to be permanently totally disabled as a result of the workplace-induced aggravation of his AS.

In the years since those determinations, petitioner's AS progressed, affecting various other parts of his body. At a hearing before the ALJ on December 22, 2009, and in a post-hearing brief, petitioner pressed his claim that the Employer is obligated to reimburse him for expenses for medical treatment related to his bi-lateral hip and knee problems, recommended neck surgery, fibromyalgia, enthesopathy, restrictive lung disease, heart ailment, and an eye condition, and for gastroenterology services. He also cited problems with his ankles and wrists and requested reimbursement for costs incurred for home attendant services, shaving, and transportation.[2] In addition, as already described, petitioner sought a 20% penalty award for the Employer's failure to make timely COLA payments.

---

1. *See* D.C.Code § 32–1515(f) (2001) ("the penalty statute") ("If any compensation, payable under the terms of an award, is not paid within 10 days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20% thereof[.]").

2. Specifically, petitioner sought $136,395 for assisted living expenses (including monthly payments of $1,500 to his wife in exchange for services such as mowing the lawn, preparing meals, and helping him with personal hygiene); $80,880 for shaving costs; $479,050 for transportation; and reimbursement for out-of-pocket expenses for plumbing work, planting flowers, and widening the driveway at his home.

The ALJ rejected petitioner's expense-reimbursement claim because he found, variously, that petitioner failed to prove that the medical conditions claimed to necessitate the expenses were caused or aggravated by his work for Employer; that some of the services were not reasonably necessary; and that petitioner failed adequately to document his claim. The ALJ concluded, however, that petitioner had established his entitlement to the 20% penalty for the Employer's having underpaid bi-weekly compensation for the period at issue.

Petitioner now claims that the CRB erred in affirming the decision of the ALJ "on issues of causal connection and the reimbursement of expenses." Petitioner argues that prior rulings of the DOES Office of Worker's Compensation ("OWC")—what he terms the "law of the case"—are binding both as to the causal relationship between the 1986 workplace injury and the problems associated with his AS, and as to the coverage of his expenses for home attendant and other services. Petitioner contends that the ALJ erred "in not following these previous rulings on these issues." He also argues that the ALJ erred in "denying *all* expenses" for transportation, shaving, handyman, podiatry and home modification services," and that the ALJ "incorrectly dismissed" Dr. Thomas's rebuttal of an August 2004 utilization review report on which the ALJ relied. In addition, petitioner argues that the CRB "appl[ied] the incorrect legal standard in reversing the ALJ finding as to penalties."

## II. Standard of Review

 This court's task is to determine whether the CRB's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Muhammad v. District of Columbia Dep't of Emp't Servs.*, 34 A.3d 488, 491 (D.C.2012) (internal quotation marks omitted). We are guided by the principle that "[i]f substantial evidence exists to support the [ALJ's] findings, the existence of substantial evidence to the contrary does not permit the [CRB] to substitute [its] judgment for that of the [ALJ] ... even if there was also substantial evidence to support a contrary conclusion." *Marriott Int'l v. District of Columbia Dep't of Emp't Servs.*, 834 A.2d 882, 885 (D.C.2003). The CRB may not "consider the evidence *de novo* and make factual findings different from those of the [ALJ]." *Id.* (citing *Canlas v. District of Columbia Dep't of Emp't Servs.*, 723 A.2d 1210, 1211 (D.C.1999)).

 As to questions of law, our review is de novo. *Muhammad*, 34 A.3d at 491. While we "accord weight to the agency's construction of the statutes which it administers, the ultimate responsibility for deciding questions of law is assigned to this court." *Id.* (internal quotation marks and alterations omitted).

## III. Analysis

### A. Reimbursement Payments

 Under D.C.Code § 32–1521 (2001), a private sector worker's compensation claimant is entitled to a presumption that his claim "comes within the WCA [i.e., the Workers' Compensation Act]." *Smith v. District of Columbia Dep't of Emp't Servs.*, 934 A.2d 428, 435 (D.C.2007).

To benefit from the statutory presumption, the employee need only show some evidence of a disability and a work-related event or activity which has the potential of resulting in or contributing to the disability. Such a showing effectuates the presumption, which operates to establish a causal connection between the disability and the work-related event, activity, or requirement, and shifts the burden of production to the employer to produce substantial evidence demonstrating that the disability did not arise

out of and in the course of employment. The statutory presumption may be dispelled by circumstantial evidence specific and comprehensive enough to sever the potential connection between a particular injury and a job-related event. *Id.* at 435–36. If the employer "succeed[s] in dispelling the statutory presumption, the burden then shifts back to the claimant to show, by a preponderance of evidence, that the injury was in fact causally related to the petitioner's work." *Id.* at 436.

■■■■ "Although in a workers' compensation case, we review the decision of the CRB, not that of the ALJ, we cannot ignore the compensation order which is the subject of the Board's review." *District of Columbia Dep't of Mental Health v. District of Columbia Dep't of Emp't Servs.,* 15 A.3d 692, 692 (D.C.2011) (internal quotation marks, alterations, and ellipsis omitted). In this case, the ALJ found either that the Employer "offered sufficient medical rationale to sever the causal connection between" the 1986 workplace injury and the medical conditions to which the petitioner's expenditures relate; or, as to some of petitioner's medical conditions, that the WCA "does not afford [petitioner] a presumption[.]" The CRB's conclusion that substantial evidence supports the ALJ's findings is supported by the record, and must be affirmed.

Contrary to petitioner's argument, the OWC's prior rulings were not a bar to the ALJ's various findings. In H & AS 92–359 (April 30, 1993), the hearing examiner rejected the Employer's claim that petitioner's condition was "different at this time," finding that the Employer's medical expert had made "virtually the same medical findings and conclusions on causality that he did in the 1987 medical report"

that had been before the agency when the original (1987) Compensation Order awarding benefits was issued, and that the expert "gave no indication of whether [petitioner's] physical disability has improved, resolved, or worsened." In OHA No. 92–359D (April 15, 1999), the hearing officer found that the Employer had provided "no medical opinion evidence suggesting that the treatment [for which petitioner then sought reimbursement] is not related to the [1986] work injury." Similarly, in OHA No. 92–359F (June 10, 2003), the ALJ found that the Employer's medical expert had proffered no opinion "as to whether [petitioner's then-] current level of the disease ... is the result of the natural progression" of petitioner's AS, and therefore concluded that petitioner's "current condition remains causally related to the injury he sustained while in the course of his employment in December 1986." [3]

By contrast, in connection with the hearing that resulted in the February 3, 2010, Compensation Order, the Employer presented evidence that petitioner's medical conditions underlying his reimbursement claim are the result of the natural progression of his AS, rather than causally related to the 1986 work injury. As the ALJ noted, independent medical examiner Dr. Peter Oroszlan opined after examining petitioner in 2005 that petitioner's long hours sitting at work in 1986 "temporarily aggravated" his symptoms in his neck and low back," but that petitioner's employment did not "worsen" or "cause" his AS," and that "there is absolutely no medical justification to attribute any of [petitioner's] current signs and symptoms ... to the previous claim." Dr. Oroszlan testified at his December 2005 deposition that neither pe-

---

3. In addition, as the ALJ explained, although a March 18, 2003, H & AS decision concluded that petitioner's expenses for home-attendant services could be reimbursable if reason-

able, the ultimate resolution was that the parties were to submit the issue to utilization review.

titioner's shoulder impairment nor his problems with his hips, knees and ankles, nor his cardiovascular and respiratory system problems, nor "any of his problem[s] that he's having at the present time" was "caused or aggravated by" the 1986 workplace injury.

Similarly, after examining petitioner, Dr. Robert Gordon opined in 2009 that petitioner's hips and knees "were not affected by [his] sedentary job," and stated in 2008, "I also do not believe that [petitioner's] present condition is in anyway different than it would have been if he had not been employed" as he was in 1986.[4] Rheumatologist and independent medical examiner Dr. Joseph Laukaitis, who also examined petitioner, described the "normal progression" of AS, which "often" includes joints outside of the spine becoming inflamed, degenerated, and painful. Dr. Laukaitis opined in a September 2003 letter, "I do not believe that [petitioner's] current condition is due to injury at work in 1986."

The ALJ reasonably found that these opinions "rebutted" and "sever[ed] the causal connection between [petitioner's] bilateral hip and knee conditions," need for neck surgery, and other medical conditions, and his 1986 work injury. With the presumption rebutted, the ALJ found, petitioner did not "offer any medical evidence to support his allegation that the work incident caused" his medical conditions or his need for his neck surgery. The record supports that conclusion; as the ALJ correctly summarized, treating physician Dr. Thomas "conceded there was no medical rationale to support a causal connection between the work incident and [petitioner's] medical condition."[5]

With regard to gastroenterology services, fibromyalgia, enthesopathy services, restrictive lung disease, cardiology treatment, and eye treatments, the ALJ again noted that while these appear to be related to petitioner's AS, petitioner "failed to provide sufficient medical evidence" to indicate that the underlying conditions were caused by the work-related injury. As to these conditions and treatments, the ALJ reasonably found, petitioner "failed to provide sufficient medical evidence to apply the presumption" of compensability, since Dr. Thomas, did not "offer[ ] an opinion explaining ... how sitting at computer for 12 hours a day caused the conditions."

With regard to petitioner's claim for reimbursement for assisted-living expenses, plumbing services, and home modifications, the ALJ relied on an August 2003 utilization review report that concluded that petitioner's "medical records ... do not indicate deficits in his ability to independently perform Activities of Daily Living." The utilization review report also noted that petitioner had been "observed ambulating, transferring, bending over, moving his upper and lower extremities and operating a vehicle." Petitioner argues that the ALJ erred by disregarding Dr. Thomas's response to the utilization review report. The ALJ stated in the Compensation Order that Dr. Thomas "did not offer any supporting rationale for rejecting the opinion of the utilization report" and provided the ALJ with "no specific reasons to question" the report's findings. We note

---

4. In his April 17, 2009, memorandum, Dr. Gordon also called the effort to "causally relate any potential left knee and right hip replacements to [petitioner's] occupation sitting at a computer terminal" in 1986 the "most incredible claim I have ever heard in all the years I have practiced orthopedic surgery."

5. For example, at his March 2004 deposition, Dr. Thomas could only "guess[ ]" that petitioner's shoulder problems might "potentially theoretically" be related to his sitting and looking at a computer screen in 1986. Dr. Thomas stated that he did not know how "looking at a computer screen in 1986" would affect petitioner's hands and feet in 2004.

that Dr. Thomas did specifically explain that a motorized wheelchair (which the utilization review report concluded was "not indicated") is medically indicated since petitioner is "at high risk for falling" when he uses a cane, "does not have the mobility in his hips, spine, and shoulders to safely use a cane all the time for ambulation," and "cannot adequately use a non motorized wheelchair." In addition, Dr. Thomas's statement that he "disagree[d] with the [utilization review report's] assessment[ ] . . . regarding the assisted living facility" is preceded by his statements that petitioner is "severely disabled in multiple aspects" and requires assistance in multiple activities of daily living. Thus, the ALJ's findings do somewhat mischaracterize Dr. Thomas's response.

However, the ALJ also found that Dr. Thomas did not seek reconsideration of the utilization review report, as contemplated by D.C.Code § 32–1507(b)(6)(C) (2001), and the CRB noted that "at the formal hearing, [petitioner] withdrew his request for a new utilization report." In addition, the ALJ cited Dr. Laukaitis's conclusion, reached after reviewing videotaped evidence of petitioner driving and performing other activities, that petitioner did not require assistance to tend to his "personal needs and activities of personal living." The ALJ also emphasized Dr. Thomas's finding that petitioner "had no evidence of muscle atrophy," as would be expected if he used a wheelchair constantly. For these reasons, we are satisfied that the CRB did not err in concluding that substantial evidence supports the ALJ's reliance on the conclusions of the utilization review report.

While noting Dr. Thomas's deposition testimony that petitioner had "asked for a prescription for a barber . . . because of his shoulders," the ALJ found that the medical evidence did not establish that the 1986 work injury caused or aggravated petitioner's bi-lateral shoulder problems. The ALJ therefore concluded that petitioner did not establish his entitlement to reimbursement for shaving expenses. The medical opinions described above provided substantial evidence for the ALJ's conclusion. The ALJ further found that petitioner's "itemization for transportation" lacked the necessary documentation to relate the expenditures to his claim, and that his reported charges per trip, without mileage documentation, "appear[ed] excessive." While petitioner argues that the ALJ should not have questioned *all* of his transportation expenses, the ALJ reasonably found that this caution was warranted because of petitioner's having sought to "expand his claim unsuccessfully to include the hips and knees and a host of other medical conditions" not related to his workplace injury.

The ALJ's findings and reasoning discussed above are supported by the record, and thus we have no basis for disturbing the CRB's ruling upholding this portion of the Compensation Order.

### B. The 20% Penalty

■ The CRB reversed the portion of the Compensation Order that awarded petitioner a 20% penalty for underpayments between February 1990 and July 1997 on the ground that the record "does not establish the claimant made a timely application for a default order for late payment penalties." The CRB's references to a "default" order and to timeliness were derived from D.C.Code § 32–1519(a) (2001), which states in relevant part:

> In case of default by the employer in the payment of compensation due under any award of compensation for a period of 30 days after the compensation is due and payable, the person to whom such compensation is payable may, within 2 years after such default, make application to the Mayor for a supplementary order declaring the amount of the default.

Petitioner argues that the CRB erred in overturning the ALJ's ruling as to the 20% penalty, asserting that until the ALJ's ruling, "there was no '[a]ward' [i.e., no penalty award] which would trigger the two-year default period."

As the CRB appeared to reason, and as the parties have framed the issue in their briefs to us, the issue presented was when the "2 years" referenced in § 32–1519(a) began to run in the circumstance presented here (i.e., where the "compensation due" was the "automatic" 20% penalty).[6] Did the two years begin to run when the Employer was 30 days late in making the full biweekly benefit payments owed to petitioner, as established by previous compensation orders? (This is the interpretation that appears to underlie both the CRB's ruling and Employer's assertion that petitioner brought his claim for the penalty amount "more than twelve years after" the award.) Or, instead, would the two years have begun to run (as petitioner implies) only after the issuance of the February 3, 2010 Compensation Order confirming that petitioner "has established entitlement to a 20% penalty for unpaid compensation for benefits for the period of February 22, 1990 to July 13, 1997"? We conclude that, while the foregoing questions may ultimately be involved, the actual issue is whether what petitioner sought (and obtained) through his hearing before the ALJ was "a supplementary order declaring the amount of the default" within the meaning of § 32–1519(a), and, thus, whether the two-year limit described in § 32–1519(a) was implicated in this case.

■■■ We begin our analysis by acknowledging that we "must give weight to any reasonable construction of a regulatory statute that has been adopted by the agency [here, the DOES CRB] charged with its enforcement." *National Geographic Soc'y v. District of Columbia Dept. of Emp't Servs.,* 721 A.2d 618, 620 (D.C.1998) (internal quotation marks omitted) (noting that "[u]nless the agency's interpretation is plainly wrong or inconsistent with the statute, we will sustain it even if there are other constructions which may be equally reasonable."). Nevertheless, " '[u]nexplained' inconsistency in an agency's interpretation of its governing statute can be 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.' " *Marmolejo–Campos v. Holder,* 558 F.3d 903, 914 (9th Cir.2009) (citing *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005)).[7] Such an unexplained inconsistency is what we are presented with in this case.

The CRB previously has explained that § 32–1519(a) "exists for the purpose of permitting persons 'to whom compensation is payable' to avail themselves of the judgment enforcement procedures available through resort to the D.C. Superior Court." *Brown v. Davis Mem'l Goodwill Indus.,* 2007 DC Wrk. Comp. LEXIS 378,

---

6. *Hard Rock Cafe v. District of Columbia Dep't of Emp't Servs.,* 911 A.2d 1217, 1220 n. 4 (D.C.2006) (citing persuasive authority that the penalty should be deemed "self-executing[,] . . . mandatory and automatic").

7. *Cf. Hall v. Baker,* 867 F.2d 693, 696 (D.C.Cir.1989) (holding that where agency "provided no explanation whatever for its departure from its prior interpretation of the statute," it "arbitrarily violated the 'presumption against unexplained changes in agency interpretations.' " (quoting *Japan Air Lines Co. v. Dole,* 801 F.2d 483, 486 (D.C.Cir. 1986))); *Lehman v. Burnley,* 866 F.2d 33, 37 (2d Cir.1989) ("When an agency changes its interpretation of a statute, a reviewing court must determine whether the change was 'accompanied by a reasoned explanation of why the new rule effectuates the statute as well as or better than the old rule.' ") (quoting *New York Council, Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.,* 757 F.2d 502, 508 (2d Cir.1985)).

*3 n. 2 (Oct. 10, 2007). In *Brown,* and in at least two other decisions that pre-date the CRB's decision in the instant case, the CRB has emphasized that "there is a significant and important distinction" between defaults (addressed in § 32–1519(a)) and penalty determinations. *Brown, id.; see also Deane v. Total Blood Mgmt., Inc.,* 2007 WL 1857191, *1 n. 2, 2007 DC Wrk. Comp. LEXIS 241, *2 n. 2 (May 17, 2007) (same); *Applewhite v. Hawk One Security,* 2008 WL 400403, *1 n. 2, 2008 DC Wrk. Comp. LEXIS 2, *2 n. 2 (Jan. 17, 2008) (noting that the "Board has pointed [this distinction] out in prior orders"). In *Deane,* the claimant sought review of a March 2007 supplemental compensation order in which the ALJ had "awarded a 20% penalty for late payment of an award for permanent partial disability benefits which award was contained in a Compensation Order issued December 29, 2006...." 2007 WL 1857191, at *1, 2007 DC Wrk. Comp. LEXIS 241, at *2. The CRB observed that "this case does not in fact deal with a 'default,' as that term is used in ... § 32–1519, in which an award that remains unpaid after 30 days of coming due may be declared in default, for the purposes of enabling enforcement of the aw[a]rd through resort to the courts of the District of Columbia." *Id.* at *1 n. 2, 2007 DC Wrk. Comp. LEXIS 241, at *2 n. 2. Rather, the CRB instructed, "[t]his case, ... deals solely with a penalty for late payment, *which is not a default.*" *Id.* (emphasis added). *See also Brown,* 2007 DC Wrk. Comp. LEXIS 378 at *3 n. 2 (explaining, in an appeal from the claims examiner's award of a 20% penalty for late payment of an approved settlement agreement, that "the order under review herein is not an 'Order Declaring Default', as that term is used in [§ 32–1519]. Rather, it is

a determination that a penalty should be awarded because a payment of compensation was made late, not a determination that that a payment has not been made. This is a significant and important distinction...").

Thus, in previously interpreting § 32–1519(a), the CRB has explained repeatedly that it does not pertain to the situation—such as the one involved in the instant case—in which a claimant seeks a compensation order establishing that the claimant is entitled to payment of 20% penalty. Instead, the CRB has consistently said in previous decisions, § 32–1519(a) would govern the situation in which a DOES compensation order has awarded a 20% penalty, an employer thereafter has failed to pay the penalty, and the claimant responds by seeking an order of default that can be presented to the Superior Court to seek judicial enforcement of the penalty award. Under this previous CRB interpretation, reflected in the three decisions cited in the paragraph above, what was before the ALJ in the instant case was petitioner's request for a compensation order awarding (or establishing his entitlement to) a penalty, *not* a request under § 32–1519(a) for a supplementary order declaring the Employer in default of a penalty award. The CRB's interpretation in its June 29, 2011, Decision and Order in this case—in which it treated petitioner's application for a hearing before the ALJ as an "application to the Mayor for a supplementary order declaring the amount of the default"—is squarely inconsistent with the agency's prior interpretation.[8]

The CRB is not precluded from changing its interpretation of § 32–1519(a) if it believes that a different interpretation is more consistent with the statutory lan-

---

**8.** It thus appears that the CRB failed to heed its own admonition that "to avoid confusion," counsel and others should "avoid usage of this term [default] in ... contexts" where it

does not apply. *Brown,* 2007 DC Wrk. Comp. LEXIS 378 at *3 n. 2; *Applewhite,* 2008 WL 400403, at *1 n. 2, 2008 DC Wrk. Comp. LEXIS 2, at *2 n. 2.

guage and legislative intent, but if it does so, it is obligated to provide an explanation of the change.[9] The CRB did not do that in the brief discussion contained in its order in this case. Indeed, in its cursory discussion of the issue, the CRB did not even acknowledge the conflict with its previous decisions, and we are given no reason to think that its new interpretation purports to represent a more reasonable interpretation of the statutory language. We conclude that the CRB's ruling on the 20% penalty—i.e., that petitioner's request for a penalty award was an untimely "application for a default order" and that, because of the two-year limit referenced in § 32–1519(a), the ALJ "did not have authority to award penalties for a default in 1997"—was arbitrary and capricious and must be reversed. Further, because "we acknowledge the CRB's expertise and ... responsibility for administering the Workers' Compensation Act," *Asylum Co. v. District of Columbia Dep't of Emp't Servs.*, 10 A.3d 619, 625 (D.C.2010) (quoting *Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 960 A.2d 603, 606 (D.C.2008)), we conclude that the appropriate course is to "remand the case to enable the [CRB] to consider in the first instance" whether its earlier interpretation of § 32–1519(a), or instead the revised interpretation that appears to underlie its June 29, 2011, Decision and Order, is more consistent with the WCA's purpose and legislative intent. *See Moore v. District of Columbia Dep't of Emp't Servs.*, 813 A.2d 227, 230 (D.C.2002) (setting aside the decision of the DOES Director and remanding "to enable the Director to consider in the first instance the applicability of law and regulations" discussed in the opinion); *see also Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 32 (D.C.Cir.1977) (explaining that, as a general rule, "unexplained inconsistencies in agency policy ... require ... [a] remand ... to the agency to allow it to 'supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored' "); *Alabama Power Co. v. F.C.C.*, 773 F.2d 362, 371, 372 (D.C.Cir.1985) (concluding that the agency appeared to have adopted a position inconsistent with its prior decisions and remanding the case to the agency because, "[w]hile we do not foreclose the possibility that the Commission might be able to reconcile its contradictory positions, nothing yet in the record successfully does so.").[10]

The Employer urges us to uphold the CRB's ruling that no penalty is owed

---

9. *See Central States Motor Freight Bureau, Inc. v. I.C.C.*, 924 F.2d 1099 (D.C.Cir.1991) ("An agency, of course, may change its interpretation of a governing statute, but only if it provides cogent reasons for doing so.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)); *Advanced Micro Devices v. C.A.B.*, 742 F.2d 1520, 1542 (D.C.Cir.1984) ("An agency changing its course must supply a reasoned analysis that prior policies and standards are being deliberately changed, not casually ignored.") (quoting *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (D.C.Cir.1970)).

10. Our holding that remand is appropriate in this case rests in part on our recognition that federal appellate courts have addressed a sim-

ilar issue in interpreting virtually identical provisions of the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–950. (The LHWCA is the predecessor to the District's current worker's compensation statute, *see Joyner v. District of Columbia Dep't of Emp't Servs.*, 502 A.2d 1027, 1030 (D.C.1986), and this court is guided by judicial interpretations of its "analogous" provisions. *Id.*) The LHWCA declaration-of-default provision found at 33 U.S.C. § 918(a) is almost identical to D.C.Code § 32–1519(a). Similarly, the 20% penalty provision of 33 U.S.C. § 914(f) is almost identical to D.C.Code § 32–1515(f). The federal courts' interpretations of the interplay between these provisions have not been entirely consistent.

on two other grounds, both of which we must reject. First, the Employer cites a March 2000 Memorandum of Informal Conference that resolved petitioner's claim for COLAs for 1999 and 2000, and a September 2004 Memorandum of Informal Conference that resolved petitioner's claims for COLAs and a supplemental allowance for the years 2001–2004. The Employer then asserts, in a single sentence without accompanying argument, that "the doctrine of res judicata should apply to any attempts to relitigate any benefits prior to 2004." We have held repeatedly that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.... It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones[.]" *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 n. 9 (D.C. 2001) (quoting *United States v. Zannino*, 895 F.2d 1 (1st Cir.1990)). This principle applies *a fortiori* in this case because of the many factors that must be satisfied

---

One court observed that the § 918(a) declaration-of-default procedure "is limited to situations where the employer's liability already has been determined under a compensation order and the employer is in default of its payment obligations under that order." *Schmit v. ITT Federal Elec. Int'l*, 986 F.2d 1103, 1107 (7th Cir.1993) (emphasis added) (quoting *Providence Washington Ins. Co. v. Dir., Office of Worker's Comp. Programs*, 765 F.2d 1381, 1384 (9th Cir.1985)).

Other courts, however, have rejected the distinction between declarations of default under § 918(a) and orders awarding a 20% penalty under § 914(f). *See, e.g., Snowden v. Dir., OWCP*, 253 F.3d 725, 730, 731 (D.C.Cir.2001) (reasoning that where a claimant successfully seeks an order that he is entitled to a 20% penalty, (i) the resultant supplemental compensation order "is nothing more than a standard default order, plus an additional arithmetic computation"; (ii) that "whether the award of additional compensation for overdue installments and the declaration of the default are separately issued orders or combined into a single supplementary order is irrelevant"; (iii) that a supplemental compensation order is "manifestly an order for the collection of defaulted payments within the meaning of § 918(a)"; and (iv) that a contrary interpretation would "mean delays in receipt of amounts due to claimants contrary to the purposes of the Act and the specific provisions of § 918 to ensure quick payment of defaulted amounts"); *see also Tidelands Marine Serv. v. Patterson*, 719 F.2d 126, 129 (5th Cir.1983) (holding that "[a]lthough the deputy commissioner entitled his order an 'Award of Compensa-

tion Under 914(f),' and although the Benefits Review Board on appeal referred to the order merely as being one based upon a 'Section 914(f) assessment,' it is clear that in substance the order was a 'supplementary order declaring the amount of the default' within the meaning of ... § 918(a).").

In light of these decisions interpreting LHWCA provisions that are analogous to the WCA provisions implicated in this case, we think the CRB will not have, as a reasonable option, the option of simply retreating without explanation to its earlier interpretation of D.C.Code § 32–1519(a).

Another complexity is this: If, as the CRB appeared to reason, the ALJ's order declaring that petitioner is entitled to payment of the 20% penalty was "a supplementary order declaring the amount of the default" within the meaning of § 32–1519(a), the CRB may have lacked jurisdiction to review the order. *See* 7 DCMR § 271.1, providing that "[i]n the event of default by an employer in the payment of compensation ..., a request by the party to whom such compensation is payable for a declaration of such default, for the purpose of filing such declaration with the Superior Court of the District of Columbia pursuant to D.C. Official Code § 32–1519 (2001) shall be filed with and brought *solely before the Administrative Hearings Divisions, and not before the Board*" (emphasis added); *cf. Snowden*, 253 F.3d at 729 (holding that the Benefits Review Board lacked jurisdiction to review a supplementary compensation order issued pursuant to § 918(a) because such orders "are not appealable to the Board"); *Tidelands*, 719 F.2d at 129 (same).

before an administrative decision can have *res judicata* effect.

The basic principle is that "[t]he doctrine of *res judicata* operates as a complete bar to the relitigation of claims between the same parties or those in privity with them after the rendering of a valid, final judgment on the merits in a prior suit." *In re Al–Baseer*, 19 A.3d 341, 345 (D.C.2011) (quoting *Williams v. Gerstenfeld*, 514 A.2d 1172, 1179 (D.C.1986)). *Res judicata* bars relitigation not only of claims that were previously raised, but also of claims that arose "out of the same transaction which could have been raised." *Calomiris v. Calomiris*, 3 A.3d 1186, 1190 (D.C.2010) (quoting *Patton v. Klein*, 746 A.2d 866, 870 (D.C.1999)). The informal conferences that the Employer cites dealt with COLA payments for the years 1999 to 2004. The instant case pertains to payments for the years 1990 to 1997. The Employer has presented no argument to show that the earlier payments arose from the "same transaction" as the later payments addressed through informal conferences. Moreover, as we explained in *Oubre v. District of Columbia Dep't of Emp't Servs.*, 630 A.2d 699 (D.C.1993), when the issue is whether an administrative proceeding gave rise to a *res judicata* bar, the "threshold inquiry is whether the earlier proceeding [was] the essential equivalent of a judicial proceeding." *Id.* at 703 (quoting *William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1194 (D.C.1980)). It is far from clear that a DOES Informal Conference, conducted pursuant to 7 DCMR § 219, is the "essential equivalent of a judicial proceeding." We note that such conferences, which may be held over the telephone, do not require that all interested parties be present, no stenographic records are kept, and "no witnesses shall be called." *See* 7 DCMR § 219.9–.14.

Second, in an argument that the Employer apparently has advanced for the first time in its brief to us, the Employer contends that the CRB ruling reversing the penalty award should be upheld because, under Maryland law, the Property & Casualty Insurance Guarantee Corporation of the State of Maryland ("PCIGC")—which, the Employer represents, assumed responsibility for payment of worker's compensation benefits to petitioner upon the insolvency and liquidation of the Employer's former insurer—may not be required to pay penalties for late payment of worker's compensation benefits.[11] In the worker's compensation context, as elsewhere, this court generally adheres to the rule that "in the absence of exceptional circumstances, we will not entertain a claim that was not raised before the agency." *Hill v. District of Columbia Dep't of Emp't Servs.*, 717 A.2d 909, 912 (D.C.1998); *see also Moore*, 813 A.2d at 229 n. 5 (" '[C]ourts may show a measure of flexibility in this regard when the interests of justice so require.' ") (quoting *Goodman v. District of Columbia Rental Hous. Comm'n*, 573 A.2d 1293, 1301 (D.C. 1990)). The Employer has not demonstrated that an exceptional circumstance exists here.[12] Thus, we decline to under-

---

11. The Employer cites *Property & Cas. Ins. Guar. Corp. v. Yanni*, 397 Md. 474, 919 A.2d 1, 4 (2007) ("[T]he PCIGC is not obligated to pay the late-payment penalties assessed against it by the Workers' Compensation Commission because it is not an 'insurer,' ... and because the PCIGC is immune from the imposition of penalties.").

12. And to the contrary, the Employer stated the following in its written "Response to the Application for Review" filed with the CRB: "The [ALJ] also ordered the Employer and Carrier to pay the Claimant a 20% penalty on that amount so owed [for 1990 through 1997] and the Employer and Carrier, despite their belief that any amounts prior to 2004 should not even be considered, voluntarily paid per the Order of [ALJ] Roberson." That state-

take a full analysis of this new argument. We do note, however, that it amounts to a (fallacious) contention that the validity of the ALJ's ruling that petitioner is entitled to payment of the 20% penalty (the issue we are called upon to decide) depends on whether the Employer's worker's compensation carrier is judgment-proof as to the penalty. We need not resolve whether the compensation carrier could be required actually to pay the penalty to conclude (as we do) that the CRB erred in reversing, without adequate explanation, the ALJ's ruling that petitioner is entitled to payment of the penalty amount.

For the foregoing reasons, we affirm the ruling of the CRB upholding the ALJ's order denying reimbursement for the medical expenses and services in issue, but reverse the CRB's ruling as to the 20% penalty and remand the matter to the CRB for further proceedings not inconsistent with this opinion.

*So ordered.*

ment leaves us unsure about the relevance of the arguments that the Employer now makes about PCIGC.